## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## JEFFERSON CITY DIVISION

TAMMY REED, individually and as next- )
-of-kin of Brandon Pace, )
 )
   Plaintiff, )
 )
   v. )   No.
 )
MISSOURI DEPARTMENT OF )   JURY TRIAL DEMANDED
CORRECTIONS; )
<u>Serve:</u> )
Trevor Foley, Acting Director )
Missouri Department of Corrections )
2728 Plaza Drive )
Jefferson City, MO 65102 )
 )
ANNE. L PRECYTHE, individually and )
in her official capacity as the Director of )
the Missouri Department of Corrections )
at the time of certain events giving rise to )
this action; )
<u>Serve:</u> )
Trevor Foley, Acting Director )
Missouri Department of Corrections )
2728 Plaza Drive )
Jefferson City, MO 65102 )
 )
TREVOR FOLEY, individually and in his )
official capacity as Acting Director of the )
Missouri Department of Corrections; )
<u>Serve:</u> )
Trevor Foley, Acting Director )
Missouri Department of Corrections )
2728 Plaza Drive )
Jefferson City, MO 65102 )
 )
MATT STURM, individually and in his )
official capacity as the Deputy Director of )
the Missouri Department of Corrections at )
the time of certain events giving rise to this )
action; )
<u>Serve:</u> )
Trevor Foley, Acting Director )

1

Missouri Department of Corrections )
2728 Plaza Drive )
Jefferson City, MO 65102 )
                                    )
VALARIE MOSELEY, individually and in )
her official capacity as the Deputy Director )
of the Missouri Department of Corrections; )
Serve: )
Trevor Foley, Acting Director )
Missouri Department of Corrections )
2728 Plaza Drive )
Jefferson City, MO 65102 )
                                    )
TRAVIS TERRY, individually and in his )
official capacity as the Deputy Director of )
the Missouri Department of Corrections; )
Serve: )
Trevor Foley, Acting Director )
Missouri Department of Corrections )
2728 Plaza Drive )
Jefferson City, MO 65102 )
                                    )
MATT BRIESACHER, individually and in )
his official capacity as General Counsel of )
the Missouri Department of Corrections; )
Serve: )
Trevor Foley, Acting Director )
Missouri Department of Corrections )
2728 Plaza Drive )
Jefferson City, MO 65102 )
                                    )
BROCK VAN LOO, individually and in )
his official capacity as Warden of the )
Tipton Correctional Center at the time of )
the events giving rise to this action; )
Serve: )
Trevor Foley, Acting Director )
Missouri Department of Corrections )
2728 Plaza Drive )
Jefferson City, MO 65102 )
                                    )
CORRECTIONAL SUPERVISOR I )
TERRY PAYNE, individually; )
Serve: )
Trevor Foley, Acting Director )
Missouri Department of Corrections )

2

2728 Plaza Drive    )
Jefferson City, MO 65102    )
    )
CORRECTIONAL OFFICER III    )
RANDY WITT, individually;    )
<u>Serve:</u>    )
Trevor Foley, Acting Director    )
Missouri Department of Corrections    )
2728 Plaza Drive    )
Jefferson City, MO 65102    )
    )
CORRECTIONAL OFFICER II    )
JASON KIMBELL, individually;    )
<u>Serve:</u>    )
Trevor Foley, Acting Director    )
Missouri Department of Corrections    )
2728 Plaza Drive    )
Jefferson City, MO 65102    )
    )
CORRECTIONAL OFFICER II    )
JOHN SAMUELS, individually;    )
<u>Serve:</u>    )
Trevor Foley, Acting Director    )
Missouri Department of Corrections    )
2728 Plaza Drive    )
Jefferson City, MO 65102    )
    )
CORRECTIONAL OFFICER I    )
FNU SMITH, individually;    )
<u>Serve:</u>    )
Trevor Foley, Acting Director    )
Missouri Department of Corrections    )
2728 Plaza Drive    )
Jefferson City, MO 65102    )
    )
CORRECTIONAL OFFICER I    )
FNU SALZMAN, individually;    )
<u>Serve:</u>    )
Trevor Foley, Acting Director    )
Missouri Department of Corrections    )
2728 Plaza Drive    )
Jefferson City, MO 65102    )
    )
CORRECTIONAL OFFICER II    )
FNU BARKER, individually;    )
<u>Serve:</u>    )

3

Trevor Foley, Acting Director )
Missouri Department of Corrections )
2728 Plaza Drive )
Jefferson City, MO 65102 )
)
CORRECTIONAL OFFICER II )
JO MOLLAR, individually; )
Serve: )
Trevor Foley, Acting Director )
Missouri Department of Corrections )
2728 Plaza Drive )
Jefferson City, MO 65102 )
)
CORRECTIONAL OFFICER II )
BILLIE WEBB, individually; )
Serve: )
Trevor Foley, Acting Director )
Missouri Department of Corrections )
2728 Plaza Drive )
Jefferson City, MO 65102 )
)
CORRECTIONAL OFFICER III )
FNU WYATT, individually; )
Serve: )
Trevor Foley, Acting Director )
Missouri Department of Corrections )
2728 Plaza Drive )
Jefferson City, MO 65102 )
)
CORRECTIONAL OFFICER I )
FNU WARD, individually; )
Serve: )
Trevor Foley, Acting Director )
Missouri Department of Corrections )
2728 Plaza Drive )
Jefferson City, MO 65102 )
)
CORRECTIONAL OFFICER II )
EARL ROACH, individually; )
Serve: )
Trevor Foley, Acting Director )
Missouri Department of Corrections )
2728 Plaza Drive )
Jefferson City, MO 65102 )
)
MODOC JOHN/JANE DOES )

4

1-20, individually;                        )
Serve:                                     )
Trevor Foley, Acting Director              )
Missouri Department of Corrections         )
2728 Plaza Drive                           )
Jefferson City, MO 65102                   )
                                           )
CENTURION HEALTH, INC.;                    )
Serve Registered Agent:                    )
The Prentice-Hall Corp. System, Inc.       )
251 Little Falls Drive                     )
Wilmington, DE 19808                       )
                                           )
CENTURION HEALTH, LLC;                     )
Serve Registered Agent:                    )
The Prentice-Hall Corp. System, Inc.       )
251 Little Falls Drive                     )
Wilmington, DE 19808                       )
                                           )
CENTURION OF MISSOURI, LLC;                )
Serve Registered Agent:                    )
CT Corporation System                      )
120 South Central Ave.                     )
Clayton, MO 63105                          )
                                           )
NURSE NICOLE LNU,                          )
individually;                              )
Serve Registered Agent:                    )
Centurion of Missouri, LLC                 )
CT Corporation System                      )
120 South Central Ave.                     )
Clayton, MO 63105                          )
                                           )
and                                        )
                                           )
CENTURION JOHN/JANE DOES 1-10,             )
in their individual capacities;            )
Serve Registered Agent:                    )
Centurion of Missouri, LLC                 )
CT Corporation System                      )
120 South Central Ave.                     )
Clayton, MO 63105                          )
                                           )
            Defendants.                    )

**COMPLAINT**

Plaintiff Tammy Reed ("Plaintiff"), individually and as next-of-kin of Brandon Pace, deceased, by and through her attorneys, Fegan Scott LLC and the Popham Law Firm, for her Complaint against the Defendants Missouri Department of Corrections ("MODOC"); Anne L. Precythe ("Precythe"); Trevor Foley ("Foley"); Matt Sturm ("Sturm"); Valarie Moseley ("Moseley"); Travis Terry ("Terry"); Matt Briesacher ("Briesacher"); Brock Van Loo ("Van Loo"); Terry Payne ("Payne"); Randy Witt ("Witt"); Jason Kimbell ("Kimbell"); John Samuels ("Samuels"); FNU Smith ("Smith"); FNU Salzman ("Salzman"); FNU Barker ("Barker"); Jo Mollar ("Mollar"); Billie Webb ("Webb"); FNU Wyatt ("Wyatt"); FNU Ward ("Ward"); Earl Roach ("Roach"); MODOC John/Jane Does 1-20; Centurion Health, Inc.; Centurion Health, LLC; Centurion of Missouri, LLC; Nurse Nicole LNU; and Centurion John/Jane Does 1-10, states as follows:

## I. NATURE OF THE ACTION

1. Brandon Pace was serving a short sentence at the Tipton Correctional Center when correctional officers believed he had swallowed an illicit substance. Instead of providing him with medical attention and monitoring as required, the officers sprayed him at point-blank range with Oleoresin Capsicum ("OC") aerosol, or "pepper spray," from a canister intended for use only in riots. Covered in the chemical agent and handcuffed, he was left unattended in a cage within a small cell while he screamed in pain for over four hours, begging that he needed help and couldn't breathe.

2. The correctional officers and medical personnel heard Mr. Pace pleading for help for over four hours. In fact, one officer was stationed directly outside of the cell that Mr. Pace was in. But instead of lending mandated aid, those officers and medical personnel talked and joked

outside of Mr. Pace's cell, ignored his pleas, and intentionally denied him medical treatment until his untimely death.

3.      Following Mr. Pace's demise, certain Defendants engaged in a cover-up by making false reports and statements, claiming that Mr. Pace was sent to the medical unit at the prison for observation prior to his death. At no time was Mr. Pace taken to the medical unit or under medical monitoring or care. Other Defendants retaliated against inmates who dared to speak about the officers' callousness and blatant neglect that caused Mr. Pace's death.

4.      As part of the cover up of the events regarding Plaintiff's son's death, certain Defendants at the highest levels of the Missouri Department of Corrections willfully refused Plaintiff's proper requests for records and information in contravention of Missouri's Sunshine Law.

5.      Mr. Pace's mother, Plaintiff Tammy Reed, individually and as next-of-kin of Brandon Pace, brings this action against Defendants for violations of Mr. Pace's rights under the Eighth and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. §§ 1983, 1985(3), and 1988, and under the laws of the State of Missouri.

## II.      JURISDICTION AND VENUE

6.      This Court has jurisdiction over Plaintiff's claims for violations of the Eighth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. §§ 1983, 1985(3), and 1988 and 28 U.S.C. §1343. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b) because the unlawful acts, practices, and omissions giving rise to Plaintiff's claims occurred in this District. Assignment to the Central Division in Jefferson City is appropriate as the events giving rise to the claims

occurred in Moniteau County, Missouri.

8. Plaintiff's claim for attorneys' fees and costs are authorized by 42 U.S.C. § 1988 and MO. REV. STAT. § 610.027.3, .4. Plaintiff also seeks civil penalties for violations of the Sunshine Law. MO. REV. STAT. § 610.027.3, .4.

### III. PARTIES

9. Plaintiff Tammy Reed is a citizen of the United States and resides in Moniteau County, Missouri. Plaintiff is the mother and next-of-kin Brandon Pace, who died while in custody at the Tipton Correctional Center ("Tipton"), in Tipton, Moniteau County, Missouri.

10. Pursuant to MO. REV. STAT. § 537.080.1.(1), Plaintiff is an appropriate legal representative to bring this action for wrongful death and violation of Mr. Pace's constitutional rights, and to vindicate violations of her own rights.

11. Defendant Missouri Department of Corrections ("MODOC") is a state agency that operates correctional facilities in the state, including Tipton.

12. Defendant Anne L. Precythe was the Director of the MODOC at the time of the events giving rise to this action. She is sued in her individual and official capacities.

13. Defendant Trevor Foley is the Acting Director of the MODOC. He is sued in his individual and official capacities.

14. Upon information and belief, the Director of the MODOC was and is responsible for administering and overseeing the prison facilities, including but not limited to the training of officers, the medical treatment and healthcare of inmates, and otherwise creating, implementing, and executing policies, procedures, protocols, and/or customs with respect to the operations of the MODOC.

15. Defendant Matt Sturm was the Deputy Director of the MODOC at the time of the

8

events giving rise to this action. He is sued in his individual and official capacities.

16.     Valarie Moseley is the Deputy Director of the MODOC. She is sued in her individual and official capacities.

17.     Travis Terry is the Deputy Director of the MODOC. He is sued in his individual and official capacities.

18.     Upon information and belief, the Deputy Director of the MODOC was and is responsible for administering and overseeing the prison facilities, including but not limited to the training of officers, the medical treatment and healthcare of inmates, and otherwise creating, implementing, and executing policies, procedures, protocols, and/or customs with respect to the operations of the MODOC.

19.     Defendant Matt Briesacher is General Counsel of the MODOC. He is sued in his individual and official capacities. Upon information and belief, the General Counsel of the MODOC is responsible for administering and overseeing the production of MODOC documents pursuant to duly authorized requests for documents and information, overseeing the preservation of evidence in matters involving the MODOC, its agents, officials, and employees, and otherwise overseeing the policies and procedures with respect to the legal matters involving the MODOC.

20.     Defendant Brock Van Loo was Warden of the Tipton Correctional Center at the time of the events giving rise to this action. He is sued in his individual and official capacities. Upon information and belief, the Warden of Tipton was and is responsible for administering and overseeing the Tipton Correctional Center, including but not limited to the training of officers, the medical treatment and healthcare of inmates, establishing and implementing policies regarding the care of inmates in administrative segregation, and otherwise overseeing the policies, procedures, protocols, and/or customs with respect to the operations of Tipton at the time of the events.

9

21.     Defendants Payne, Witt, Kimbell, Samuels, Smith, Salzman, Barker, Mollar, Webb, Wyatt, Ward, and Roach were at all relevant times employees and agents of the MODOC at the Tipton Correctional Center at the time of the events in question acting within the course and scope of their employment. They are sued in their individual capacities.

22.     Defendants MODOC John/Jane Does 1-20 were at all relevant times employees and agents of Defendant MODOC and correctional officers and supervisors at the Tipton Correctional Center at the time of the events in question acting within the course and scope of their employment. They are sued in their individual capacities.

23.     Defendants Payne, Witt, Kimbell, Samuels, Smith, Salzman, Barker, Mollar, Webb, Wyatt, Ward, and Roach and Defendants MDOC John/Jane Does 1-20 will at times collectively be referred to as the "Correctional Officer Defendants."

24.     Defendant Centurion Health, Inc. is a Delaware corporation with its principal place of business in Sterling, Virginia.

25.     Defendant Centurion Health, LLC is a Delaware limited liability corporation with its principal place of business in Sterling, Virginia.

26.     Defendants Centurion Health, Inc. and/or Centurion Health LLC hold themselves out as "Centurion Health," and are collectively referred to herein as "Centurion Health."

27.     Centurion Health entered into a contract with the State of Missouri to provide medical services to inmates in the MODOC, including at Tipton.[1] Thus, at all times mentioned herein, Centurion Health was providing an essential government function.

28.     Defendant Centurion of Missouri, LLC ("Centurion of Missouri") is a Missouri

_____

[1] https://www.centurionmanagedcare.com/newsroom/centurion-health-begin-correctional-health-contract-for-missouri-department-of-corrections.html (last visited Aug. 27, 2024).

limited liability company with its principal place of business in Jefferson City, Missouri. Based upon information and belief, Defendant Centurion of Missouri, LLC was established to provide services pursuant to Centurion Health's contract with the State of Missouri and the MODOC in particular, and thus, at all times mentioned herein, Defendant Centurion of Missouri was providing an essential government function.

29.     Based upon information and belief, Centurion Health (Centurion Health, Inc. and/or Centurion Health, LLC) is the member and/or manager of Defendant Centurion of Missouri. Unless otherwise specified, the three Centurion entitles will collectively be referred to as "Centurion."

30.     Defendant Nurse Nicole LNU is and was at all relevant times herein an employee and agent of Centurion of Missouri, LLC, employed at the Tipton Correctional Center acting within the course and scope of her employment. She is sued in her individual capacity.

31.     Defendants Centurion John/Jane Does 1-10 were at all relevant times herein employees and agents of Centurion of Missouri, LLC employed at the Tipton Correctional Center and acting within the course and scope of their employment. They are sued in their individual capacities.

32.     Defendants Nurse Nicole LNU and Centurion John/Jane Does 1-10 will at times collectively be referred to as the "Medical Personnel Defendants."

33.     At all times, all Defendants were acting under color of state law.

34.     At all times, all Defendants were acting in concert and conspiracy and are jointly and severally liable for the harms caused to Brandon Pace.

11

## IV. FACTS

**A. Oleoresin capsicum ("OC"), commonly known as "pepper spray," is a chemical agent.**

35. Oleoresin capsicum ("OC"), or "pepper spray" as it is commonly called, is an inflammatory, chemical agent made with oleoresin capsicum, a natural oil found in hot peppers. It affects the mucous membranes in the eyes, nose, throat, and lungs, and can result in serious consequences, including a painful burning sensation of the lungs and associated shortness of breath and temporary blindness.

36. OC sprays range in concentration from 1-15%, and law enforcement typically uses sprays with higher concentrations.[2] The OC aerosol canisters use different propellants to spray the chemical agent from a distance, and those propellants can include alcohol or Butane, both of which are flammable.[3]

37. OC spray can have serious, long-lasting effects, including the risk of death, if used on individuals with underlying respiratory conditions; obese individuals; individuals who are restrained; individuals under the influence of alcohol or drugs; or if the individual is subjected to significant a volume or prolonged exposure to OC spray.[4]

---

[2] Tori Semple, Bryce Jenkins, and Craig Bennell, *Injuries and deaths proximate to oleoresin capsicum spray deployment: a literature review*, *The Police Journal: Theory, Practice and Principles,* Vol 94(2), 184-205 (2021), found at https://carleton.ca/policeresearchlab/wp-content/uploads/Injuries-and-deaths-proximate-to-oleoresin-capsicum-spray-deployment-A-literature-review..pdf (last visited Aug. 27, 2024).

[3] https://www.sabrered.com/blog/truth-about-flammable-pepper-sprays (last visited Aug. 27, 2024).

[4] MF Yeung & William YM Tang, *Clinicopathological Effects of Pepper (Oleoresin Capsicum) Spray*, 21 Hong Kong Med. J. 6 at 549 (2015), found at https://pubmed.ncbi.nlm.nih.gov/26554271/ (last visited Aug. 27, 2024).

12

**B. Brandon Pace died after being doused by Correctional Officer Defendants with a riot-sized canister of OC at close range in a confined space while restrained, and he was denied medical attention when he was in obvious distress.**

38.     On April 7, 2023, Brandon Pace was in state custody at Tipton, a MODOC correctional facility, and was assigned to general population housing.

39.     Mr. Pace was serving a 3-4 year sentence and had already served one year.

40.     Sometime in the afternoon, Mr. Pace became involved in an incident with another inmate in their housing unit. Correctional officers intervened and escorted Mr. Pace and the other inmate in restraints into administrative segregation.

41.     Administrative segregation at Tipton, sometimes called the "Hole," is a two-tiered area with cells around the perimeter.

42.     While in administrative segregation, Mr. Pace was placed inside a "cage" within a "Dry Cell." Tipton's SOP/IS 21-1.2 Administrative Segregation policy (eff. Nov. 6, 2021), signed by Defendant Van Loo, specifically defines a "Dry Cell" as a "cell or room without running water, for the purpose of recovering contraband or other unauthorized items that may be hidden in a body cavity or ingested."[5]

43.     There are two Dry Cells in administrative segregation at Tipton and, in each, there is a "cage" with four barred walls, much like a dog crate for humans. There is also a "Security Restraint Bench" near the two Dry Cells, which is a "reinforced bench secured to the floor of an Administrative Segregation Unit, in full view of staff, used to temporarily secure an offender."[6]

44.     One of the two Dry Cells in administrative segregation contains video cameras for monitoring the inmate(s) within, called a "Camera Cell," which according to the above-referenced

---

[5] Tipton's SOP/IS 21-1.2 Administrative Segregation policy (eff. Nov. 6, 2021).
[6] *Id*.

13

policy is specifically "utilized to continuously monitor occupants through use of a video camera."[7]

45.    Both Dry Cells in administrative segregation at Tipton are temporarily used as "Strip Search Cells." Inmates are requested to strip out of their clothes so that the correctional officers can search their clothes for contraband while they await assignment to a cell within administrative segregation at which time they will be given an orange jumpsuit as a visual indicator that they are housed in administrative segregation.

46.    While he was in the cage within the Dry Cell and likely handcuffed or otherwise restrained, and not presenting a danger to himself or others, Defendants Witt and Barker requested that Mr. Pace be strip searched.

47.    Based upon information and belief, Defendant Webb was also present and requested that Mr. Pace comply with the order to be strip searched. She told Defendant Witt that Mr. Pace ate something.

48.    Defendant Barker told Defendant Witt that Mr. Pace swallowed "meth," meaning methamphetamine.

49.    Based upon information and belief, the Correctional Officer Defendants are or should be trained that medical attention and/or medical monitoring is mandated if they believe that an inmate consumed an illicit substance.

50.    Had these Defendants believed that Mr. Pace had swallowed an illicit substance, he should have been taken to the medical unit for medical observation and attention or, at a minimum, medical personnel should have attended him.

51.    However, neither Defendants Witt, Barker, or Webb, nor any of the other Correctional Officers Defendants present including based upon information and belief Defendants

---

[7] *Id.*

Wyatt and Ward, took Mr. Pace to the medical unit or called medical personnel to check on him.

52. Instead, they notified Defendant Payne, the highest ranking officer present, who arrived and directed Mr. Pace to "strip out" or be strip searched. When Mr. Pace refused, Defendant Payne instructed Defendant Witt, "Get the team ready," referring to the Correctional Emergency Response Team ("CERT team").

53. The CERT team, which wears black attire and protective gear, is composed of five members who perform "cell extractions" of recalcitrant inmates and other like tasks that involve the use of force. MODOC admits that the CERT team is to "respond to and resolve major disturbances within DOC facilities."[8]

54. Correctional officers next began covering up the windows of the cell doors in administrative segregation with magnets to prevent the inmates from witnessing the events that were about to transpire. However, several inmates were able to see through misaligned window coverings or to look through the "chuckhole" of their doors. Nevertheless, all of those in administrative segregation heard the subsequent events and smelled the OC spray.

55. Certain Correctional Officer Defendants arrived as a part of the CERT Team, including Defendants Kimbell, Samuels, Smith, and Salzman. Some wore black, CERT team attire.

56. Defendant Kimbell brought a large canister of OC.

57. OC in the larger canister looks like a fire extinguisher with a trigger handle and spray hose attached. The large canister is called MK-46 and is intended to be used for riots. It is "intended for use in crowd management and will deliver 26 short bursts of OC at an effective range

---

[8] https://abc17news.com/news/missouri/2024/03/08/attorneys-for-othel-moores-family-say-docs-emergency-response-team-led-to-death/ (last visited Aug. 28, 2024).

of 25-30 ft."[9] It is often called a "super-soaker" because it delivers an excessive dose and is expressly used for large crowds and multiple targets.[10]

58.     One member of the CERT Team operated a video camera.

59.     Video recording is done to memorialize the events to protect both the inmate and the correctional officers and to avoid any dispute about what transpired. Based upon information and belief, when the CERT team responds to an incident such as a planned use of force that occurred that day, video recording is mandatory.

60.     Defendant Witt then took the MK-46 canister of OC and sprayed Mr. Pace with an excessive dose of the chemical agent at close range while Mr. Pace was in a confined space and, based upon information and belief, Mr. Pace's hands were restrained behind his back and his legs shackled.

61.     Because, based upon information and belief he was handcuffed with his hands behind his back, Mr. Pace had no way to deflect the OC spray, shield his face from the spray, or wipe it off afterwards.

62.     Mr. Pace began screaming in pain, gasping for air, and saying "I can't breathe." He kept saying, "Help me, I can't breathe," over and over.

63.     The other inmates in administrative segregation could smell the OC spray as it permeated their cells. Some of them began coughing from the OC vapor and had difficulty breathing. Defendant Ward began coughing from the OC vapors and he covered his face to block the smell.

64.     All of the inmates in administrative segregation could hear Mr. Pace's cries for

---

[9] https://www.defense-technology.com/product/first-defense-oc-cs-mk-46v-stream-aerosol/ (last visited Aug. 28, 2024).
[10] *Id.*

16

help.

65.     After the spraying, Defendant Barker was stationed directly outside of the Dry Cell that Mr. Pace was in.

66.     Based upon information and belief, video recording of Mr. Pace inside the cage in the Dry Cell continued.

**C.  Mr. Pace was denied medical treatment by the Correctional Officer Defendants and Medical Personnel Defendants after being doused with OC spray, even though he begged for help for over four hours until his death.**

67.     Despite being covered in a massive quantity of OC in a confined space, Mr. Pace was refused medical attention by the Correctional Officer Defendants and Medical Personnel Defendants. He cried over and over, "Help me. Get medical. I can't breathe. Help me." His cries were ignored by all medical and correctional personnel in administrative segregation that day.

68.     At some point, Defendant Webb said to Defendant Witt, "He's saying he can't breathe," referring to Mr. Pace. Defendant Witt responded, "I don't give a fuck."

69.     An inmate asked Defendant Barker what had occurred, and Defendant Barker replied that Mr. Pace did not give up the "dope" and that "he ate ice," which is slang for crystal methamphetamine.

70.     Although the Correctional Officers Defendants present believed that Mr. Pace had consumed an illicit substance, and despite his incessant requests for help, at no time on April 7, 2023, was Mr. Pace taken to the medical unit for observation or monitoring, or medically monitored, observed, or treated in any way.

71.     To the contrary, Mr. Pace was ignored and unattended for approximately four hours while he moaned, "Help" or "I can't breathe." In fact, several times Defendant Nurse Nicole came to where Defendant Barker was stationed outside of the Dry Cell that Mr. Pace was in, and talked and laughed with Defendant Barker, yet she ignored Mr. Pace's pleas for help and never tended to

17

him.

72.     Certain inmates in administrative segregation were requesting that the Correctional Officer Defendants and Medical Personnel Defendants provide medical attention to Mr. Pace. Their requests were also ignored.

73.     The Correctional Officer Defendants and Medical Personnel Defendants were aware that Mr. Pace was suffering from a serious medical need requiring emergency medical intervention. Despite this obvious medical emergency, those Defendants failed to summon or provide any assistance for Mr. Pace.

74.     SOP/IS 21-1.2 Administrative Segregation mandates that "Emergency medical services shall be provided as needed." At no time after begging for help and claiming that he could not breathe until his death four hour later, and despite the repeated request of other inmates for aid for Mr. Pace, was Mr. Pace provided medical services.

75.     As Mr. Pace's moaning and pleas of "Help, I can't breathe" continued for hours, they became weaker and less frequent. When Mr. Pace's pleas stopped over four hours later, several inmates requested that Defendant Nurse Nicole check on him. When she did, he was dead and she called Code 16, which is the medical emergency code.

76.     At that point, Mr. Pace was dead in his cell, still handcuffed and shackled.

77.     At that point, Defendant Barker left his post outside of the Dry Cell that Mr. Pace was in and ran to get the Narcan (naloxone), which is used to counteract opioid overdoses. Narcan has no effect on methamphetamine, which is what the Correctional Officer Defendants believed Mr. Pace had consumed.

78.     Other medical personnel and correctional officers arrived, and Narcan was administered to Mr. Pace post-mortem.

18

79.     Defendant Payne said to other correctional officers present words to the effect of, "Make sure you get the restraints off of him before the ambulance arrives," in an attempt to cover-up that Mr. Pace was restrained when he suffered and died.

**D.    Defendant Van Loo and the Correctional Officer Defendants attempt to cover-up their brutality by threatening inmates and falsifying reports, claiming that Mr. Pace was taken for medical observation prior to his death.**

80.     It was only at the point when Brandon Pace was dead that he was provided medical attention. Medical personnel were called to the scene and an attempt was made to revive him. Narcan was administered.

81.     An inmate in administrative segregation said to Defendant Roach, "They killed that guy," referring to Brandon Pace. Defendant Roach responded, "We didn't kill him. He was kinda like a dog that ran out on the street, and we were just the car that hit him."

82.     Defendant Mollar learned what that inmate had said to Defendant Roach, and she threatened that inmate by saying, "You don't know how to keep your mouth shut. You're a security risk." Thereafter, Defendant Mollar relieved this inmate of his duties as a trusted porter in retaliation for what he said.

83.     Based upon information and belief, other inmates at Tipton were charged with spurious infractions because they said things such as "Rest in Pace" or otherwise referred to Mr. Pace's death. The Correctional Officer Defendants did this to instill fear in the inmates to stop them from speaking about the brutality and callousness that led to Mr. Pace's death.

84.     Based upon information and belief, other inmate eyewitnesses who were in administrative segregation at the time of the events were transferred from Tipton to other facilities due to bogus infractions concocted by the Correctional Officer Defendants to similarly stop them from discussing the events among themselves and other inmates.

85.     Tipton's Warden at the time, Defendant Van Loo, did not request or order any

19

independent, third-party investigation of the events. Instead, Defendant Van Loo personally oversaw the investigation.

86.     After his death, Mr. Pace's body was taken to a funeral home for an unknown number of days.

87.     The Boone/Callaway County Medical Examiner's Office ("ME's Office") ultimately took possession of Mr. Pace's body and conducted an autopsy on April 21, 2023, two weeks after his death. Two months later, on June 2, 2023, the ME's Office issued the autopsy report.

88.     The autopsy report memorialized that Defendant Van Loo had told the ME's Office that Mr. Pace took an unknown substance *on video* and that ***he was taken to the medical unit*** where he "***coded***:"

> Investigation by Brock Van Loo, the warden of the Tipton Correctional Center, reports that the decedent was in prison for drug use and was seen on video taking an unknown substance. Staff took him to the medical unit for observation and the decedent coded in the unit. Emergency medical services arrived and attempted to resuscitate the decedent for 30 minutes before pronouncing the decedent dead. The warden's investigator's report is on file.

89.     Contrary to Defendant Van Loo's statements to the ME's Office memorialized in the autopsy report, Mr. Pace (1) was never taken to the medical unit; (2) was never under medical observation prior to his death; and (3) did not expire in the medical unit.

90.     Moreover, Plaintiff has been denied all video evidence of the events that occurred that day – including the video Defendant Van Loo says exists – despite lawful requests for such evidence.

91.     The toxicology report attached to the autopsy report indicates findings of methamphetamine and naloxone (Narcan).

20

92.     The autopsy report opines the cause of death of Mr. Pace is "methamphetamine intoxication" and the manner of death is "accidental."

**E.  The MODOC refused to provide Plaintiff information about Mr. Pace's death and failed to respond to lawful records requests.**

93.     On April 7, 2023, around 10:00 pm, Plaintiff received a telephone call from Tipton, and the female caller advised her that her son, Brandon Pace, had died. Plaintiff was not given any information regarding his death other than the fact that he was dead.

94.     On April 8, 9, 10, and 11, 2023, Plaintiff repeatedly called Tipton to speak to Defendant Van Loo to attempt to determine how her son died. Each time, her name and telephone number were taken, but her call was never returned.

95.     On April 12, 2023, Plaintiff drove to Tipton and asked to meet with then-Warden Van Loo. Defendant Van Loo met with Plaintiff but did not give her any information regarding Mr. Pace's death.

96.     On that same day, Plaintiff, through counsel, sent Defendants Briesacher and Van Loo a preservation letter and a request for all relevant documents, including "[a]ny and all documents and records regarding Brandon Pace…"

97.     According to MODOC SOP/D1-8.5 Offender Death – Notification and Organ Donation (D eff. 4/4/21; SOP eff. 6/11/22), when an inmate dies in custody, the following reports and documents must be created:

                        *       *       *

        4.  The control center or facility staff member shall immediately begin a
        separate chronological log to record events.


        5.  All staff members working in the housing unit while the emergency medical

21

measures were performed shall compose an inter-office communication containing a detailed description of the events that occurred and actions taken and submit it to the shift supervisor by the end of the shift.

*   *   *

8.  If the death is unexpected, the shift supervisor on duty shall:

a. notify the OPS manager [undefined] or designee and provide them with detailed information utilizing the unexpected death checklist form; and

b. ensure that 24 hours of video footage is secured and transferred to a storage location in accordance with the department procedure regarding evidence collection, accountability and disposal.

9.  [T]he CAO [Chief Administrative Officer] or designee shall submit a serious incident report in accordance with the department procedure regarding serious incident reporting and debriefing sessions, by the next working day, to the deputy division director and/or the probation and parole division director regarding the offender's death. This information shall include: …. any known circumstances regarding the death…

98.     These documents that MODOC policy mandates must be created are in addition to: the video taken by the CERT Team when they doused Mr. Pace in OC spray; all documents connected with that use of force; the video expressly mentioned in the autopsy report of Mr. Pace

"seen on video taking an unknown substance;" the report of Defendant Van Loo's investigation expressly mentioned in the autopsy report; the "warden's investigator's report … on file" expressly mentioned in the autopsy report; and the video of Mr. Pace in the cage in the Dry Cell.

99.     The MODOC did not provide any documents, video footage, or information to Plaintiff regarding the events leading to Mr. Pace's death.

100.    On May 2, 2023 and June 1, 2023, Plaintiff, through counsel, followed up with the MODOC regarding Plaintiff's records requests. Two months later, on June 12, 2023, Plaintiff received various historical MODOC records regarding Mr. Pace's incarceration. However, there were no documents of the events surrounding Mr. Pace's death.

101.    On July 18, 2023, Plaintiff, through counsel, followed up with her initial records request, requesting a comprehensive production from the MODOC. Plaintiff also specifically requested (1) the video referenced in Defendant Van Loo's report where Mr. Pace was seen "on video taking an unknown substance" and (2) Defendant Van Loo's investigative report discussed with the ME's office.

102.    Not having had any response, on September 7, 2023, Plaintiff, through counsel, again followed up and requested records surrounding Mr. Pace's death, including the video and reports mentioned by Defendant Van Loo.

103.    On September 8, 2023, the MODOC advised Plaintiff that it would provide the video and report requested "after receipt of a subpoena and entry of a protective order."

104.    Then, on September 15, 2023, Defendant Briesacher changed course and advised that "the video, if there is one, is a closed records pursuant to sections 217.075.1(3) and 610.021(18) as these records as [sic] the disclosure of these records has the potential to endanger the health and safety of the individuals who work at live [sic] at the prison."

105. MODOC, acting through Defendant Briesacher, therefore refused to produce the video that supposedly showed Mr. Pace consuming an illicit substance, and any other video evidence.

106. As to Defendant Van Loo's investigative report specifically mentioned in the ME's autopsy report, MODOC, through Defendant Briesacher, stated that no such report exists: "I am still researching what investigative report you are referencing as it appears that the only MODOC investigation regarding Mr. Pace's death was not completed until *after* the autopsy was completed."

107. No investigative reports – Defendant Van Loos' or otherwise – or any other documents relating to Mr. Pace's death, have been produced to Plaintiff, despite her lawful requests.

108. On October 5, 2023, Plaintiff submitted yet another request for records regarding Mr. Pace and the events leading to his death under the state's Sunshine Law.

109. On October 12, 2023, MODOC, through Defendant Briesacher, acknowledged receipt of the Sunshine Law request and promised "open records" within sixty days.

110. No records were ever provided.

111. On April 30, 2024, prior to filing this Complaint, Plaintiff, through counsel, requested that Defendants Briesacher and MODOC reconsider Plaintiffs' request for records in light of *Hynes v. Missouri Department of Corrections*, No. WD86481 (April 23, 2024).

112. In *Hynes,* the court held that the MODOC knowingly and purposefully violated the Sunshine Law by denying Ms. Hynes access to videos and other records regarding her son's death in MODOC custody. The court found that MODOC's reliance on sec. 217.075.1(3) to exempt the records was improper because the records had no relationship with institutional security. The court

24

also found that MODOC's request for a protective order prior to producing any documents was contrary to the purpose of the Sunshine Law. The court concluded that MODOC knowingly and purposefully violated the Sunshine Law.

113.     Importantly, the *Hynes* court noted, "The DOC was aware that Hynes was seeking records to investigate a civil claim relating to her son's death. The DOC refused to provide Hynes any records—other than an uncertified autopsy report—responsive to her Sunshine Law request…." Finally, the court noted that the MODOC's explanations for its conduct in the matter were not credible, because, as the trial court found: "I think the inference is something is going on there they [MODOC] don't want you to find out."

114.     Thus, the MODOC has a pattern and practice of engaging in a willful refusal to produce relevant records to hide wrongdoing of its employees and agents.

115.     The MODOC has not provided ***any*** documents to Plaintiff regarding the events surrounding Mr. Pace's death.

   **F.  To the extent Defendants raise any statutes of limitations arguments, MODOC's refusal to produce documents pursuant to duly authorized records requests tolls any statute of limitations while Plaintiff had to complete her own investigation of Mr. Pace's death.**

116.     To the extent Defendants raise any statutes of limitations arguments, the MODOC, Precythe, Foley, Sturm, Moseley, Terry, Briesacher, and Van Loo's refusal to produce documents pursuant to duly authorized records requests as alleged above delays accrual and/or tolls any statute of limitations pursuant to the discovery rule, fraudulent concealment, and equitable estoppel. Instead, Plaintiff had to complete her own investigation of Mr. Pace's death, which investigation remains ongoing.

25

### G. The Correctional Officer Defendants knew or should have known that deploying a riot-sized canister of OC aerosol at close range in a confined space constitutes excessive force.

117.     The Correctional Officer Defendants knew or should have known that deploying a riot-sized canister of OC aerosol at close range and in a confined space constituted excessive force.

118.     As early as 2002, courts have found that the use of OC spray at close range is a constitutional violation and that such use of force is objectively unreasonable. *See, e.g., Headwaters Forest Defense v. Humboldt Cnty.,* 276 F.3d 1125, 1130 (9th Cir. 2002). *See also Treats v. Morgan,* 308 F.3d 868, 873 (8th Cir. 2002) (an Eighth Amendment claim exists where an officer uses OC spray without warning on an inmate who may have questioned the officer's actions but who otherwise poses no threat; "correctional officers do not have a blank check to use force whenever a prisoner is being difficult").

119.     The Correctional Officer Defendants are or should have been trained that OC spray should only be used in justifiable use of force situations, and that it should not be used to torture or punish an inmate.

120.     The Correctional Officer Defendants are or should have been trained that the large, MK-46 canisters are only to be used for riots and crowd control and should not be used on an individual because of the volume of OC spray discharged. This is especially true if the individual is in a confined space.

121.     The Correctional Officer Defendants are or should have been trained that a victim of OC spray should not remain covered in the chemical agent, the victim should not remain in a confined space with the chemical agent for prolonged periods, and that medical attention is mandated when the victim is in distress.

122.     The Correctional Officer Defendants are or should have been trained that individuals who are obese, restrained, or under the influence of methamphetamine are at a higher

26

risk of death after deployment of OC spray.

123.     As early as 2004, the Police Policy Studies Council, which provides research-based training services to law enforcement agencies, recognized that an OC spray victim must be provided medical treatment if the symptoms persist for longer than 45 minutes or if signs of distress are observed: "A person who has been sprayed should be brought to a hospital if the symptoms persist for longer than 45 minutes or if the person requests it. Emergency medical services should be called if signs of distress are observed, e.g. loss of consciousness, difficulty breathing, chest pain."[11]

124.     According to studies published in 2015, victims of OC spray cannot remain covered in OC spray after they become compliant and must be monitored for any evidence of serious adverse effects, with prompt medical attention for any life-threatening complaints or symptoms.[12]

125.     That 2015 study aggregated earlier evidence about deaths from OC spray and reported that such deaths are more likely to occur when the victim has underlying respiratory conditions, is obese, is restrained, or is under the influence of alcohol or drugs, including methamphetamine.[13]

126.     Because Mr. Pace was restrained and in a confined space when he was sprayed with OC aerosol, the Correctional Officer Defendants should have removed him from the confined space and provided him the opportunity to wash off the chemical agent, especially because of Mr. Pace's pleas that he needed help and could not breathe.

---

[11] Fabrice Czarnecki, *Chemical Hazards in Law Enforcement*, 3 Clinics In Occupational & Envtl. Med. 3 at 443 (2004) (footnote omitted), found at https://www.theppsc.org/Staff_Views/Czarnecki/chemical_hazards_in_law_enforcement.htm (last visited Aug. 29, 2024).
[12] MF Yeung & William YM Tang, *supra,* at 551.
[13] *Id.* at 549 (citing The American Civil Liberties Union of Southern California. *Pepper spray update: more fatalities, more questions* (June 1995)).

127.    Medical monitoring and subsequent attention were all the more necessary because the Correctional Officer Defendants believed Mr. Pace had swallowed methamphetamine.

### H. MODOC has a pattern and practice of turning a blind eye when its correctional officers sadistically use OC spray to torture inmates and deny treatment thereafter.

128.    MODOC has a pattern and practice of turning a blind eye when its correctional officers sadistically use OC spray to torture inmates and deny treatment thereafter

129.    In 2008, an inmate at the MODOC's Southeast Correctional Center ("SECC") filed suit because OC spray from a MK-46 canister was discharged in his cell, and he was denied attention thereafter, not allowed to shower, and returned to his cell contaminated with OC spray. Afterwards he suffered from diminished vision, headaches, and skin rashes. *Thomas v. Northern*, 574 F. Supp. 2d 1029 (E.D. Mo. 2008).

130.    In 2009, another inmate from SECC filed suit after he was doused with "[a]n extremely large amount" of OC spray from a MK-46 canister because he refused to be strip searched in a public area. He was denied a shower and returned to his cell covered in the chemical and not allowed to shower for three days. He experienced burning in his eyes, genitals, and buttocks, and lingering symptoms of diminished vision and irritated skin. The court found that the failure to treat the inmate after the use of OC spray after the inmate complied constituted a continuing use of force. *Campbell v. Wilhite*, No. 1:07cv0018, 2009 U.S. Dist. LEXIS 8357, *13 (E.D. Mo. Feb. 5, 2009).

131.    On February 28, 2021, nine Muslim inmates at the Eastern Reception, Diagnostic Correctional Center ("ERDCC") of the MODOC were doused with OC spray while praying together in their housing unit, some at "point-blank range" and in the face. They were denied treatment for more than 15 hours. This included the denial of access to water to wash off the chemical agent, refusal for uncontaminated clothes, and denial of medical attention, resulting in

28

significant physical and emotional injuries. "Plaintiffs repeatedly called out to guards, telling them that they were in pain and needed medical attention. But medical help did not come." *Clemons, et al. v. Basham, et al.,* 4:22-cv-158 (E.D. Mo.), Verified Fourth Amended Complaint, ECF 45, ¶ 79.

132.    After the sadistic spraying, some inmates were also physically abused, forcibly stripped naked, left without clothing or blankets and forced to sleep on a cold floor, and later, retaliated against with bogus infractions and transfers to other institutions to prevent them from discussing the events with others and vindicating their constitutional rights. *Id.*

133.    The complaint in that case was filed in January, 2022, over a year before Brandon Pace's death. *See Clemons, et al. v. Basham, et al.,* 4:22-cv-158 (E.D. Mo.), ECF 1.

134.    A month after the above incident at ERDCC, in March 2021, a transgender inmate at Jefferson City Correctional Center ("JCCC") of the MODOC was slammed to the ground, and pepper sprayed directly in the eyes while on the ground and restrained by the hands and legs. Thereafter, five correctional officers, all of whom were male, forcibly stripped her naked. She was denied subsequent care to wash out the OC spray for two to three days. *Beard v. Falkenrath*, 21-CV-04211-SRB (W.D. Mo), Amended Complaint, ECF 19.

135.    The *Beard* lawsuit was filed on November 3, 2021, five months before Brandon Pace's death. *Id.,* ECF 1.

136.    Thus, prior to the events involving the use of excessive force on Brandon Pace and the denial of care, Defendants, including the MODOC and its Director, Assistant Director, and General Counsel, had direct knowledge that OC spray was routinely used by correctional officers sadistically and without justification to torture and injure inmates in custody.

137.    On December 8, 2023, nine months after Brandon Pace's death, Othel Moore was killed at the JCCC after being sprayed with an excessive amount of OC spray while strapped to a

29

restraint cart, a hood placed over his head, and then taken to a Dry Cell.[14] Mr. Moore was ignored

prior to his death during which he pleaded that he could not breathe.

138.     Initially the MODOC fired four correctional officers involved in Mr. Moore's death

"for violating DOC protocol concerning Moore's death."[15] After an independent law enforcement

investigation, however, criminal charges were filed against five MODOC officers, and ultimately,

ten people "are no longer employed by the department or its contractors" for their roles in Mr.

Moore's death.[16]

139.     After Mr. Moore's death, the MODOC "has discontinued the use of the restraint

system in which [Mr.] Moore was held" and has implemented "body-worn cameras in restrictive-

housing units at maximum-security facilities … to bolster both security and accountability."[17]

140.     Based upon information and belief, Mr. Moore was the 117th person who died in

MODOC custody in 2023.

141.     No independent or outside investigation has been conducted of the events

surrounding Mr. Pace's death.

**I.     At the time of Brandon Pace's Death, Centurion was the contracted provider for the MODOC and was mandated to provide medical attention to inmates in need.**

142.     Correctional officers are not the only personnel in MODOC institutions mandated

to render aid to inmates in distress. Medical personnel employed by Centurion are also mandated

to lend aid to MODOC inmates such as Brandon Pace.

143.     On or around November 15, 2021, Centurion entered into a contract with the

_____

[14] https://abc17news.com/news/jefferson-city/2023/12/19/family-of-man-who-died-in-jefferson-city-correctional-center-asks-for-video/ (last visited Aug. 29, 2024).
[15] https://krcgtv.com/news/local/four-officers-fired-following-inmate-death-at-jefferson-city-correctional-center (last visited Aug. 29, 2024).
[16] https://doc.mo.gov/media-center/newsroom/moore-investigation (last visited Aug. 29, 2024).
[17] *Id.*

MODOC with the express purpose to provide medical and behavioral health services to inmates in MODOC custody.[18]

144. The contract is reportedly for three-years, with four, one-year renewal options,[19] worth $1.4 billion over the seven-year period.[20]

145. MODOC touted its partnership with Centurion as one of its highlights of 2021, making clear that the beneficiaries of the contract with Centurion are the more than 23,000 incarcerated Missourians, 70% of which live with chronic medical conditions, and 20% of which have been diagnosed with a mental health condition requiring clinical care and/or medication.[21]

146. Centurion's press release announcing the new contract echoed that the contract's purpose is to provide medical services to benefit the more than 23,000 inmates in MODOC custody: "Centurion will provide medical and mental health services for approximately 24,000 incarcerated people in 19 correctional facilities and two community transition centers across the state."[22]

147. Centurion's CEO Steven H. Wheeler proclaimed that the purpose of Centurion's contact with the MODOC is to provide high-quality health care to benefit the incarcerated inmates:

---

[18] https://www.centurionmanagedcare.com/newsroom/centurion-health-begin-correctional-health-contract-for-missouri-department-of-corrections.html (last visited Aug. 29, 2024).

[19] https://www.prnewswire.com/news-releases/centurion-health-begins-correctional-health-contract-for-missouri-department-of-corrections-301423993.html (last visited Aug. 29, 2024).

[20] https://www.prisonlegalnews.org/news/2022/apr/1/centurion-health-supplants-corizon-missouri-after-court-ruling/#:~:text=Corizon%20filed%20suit%20in%20state,bidding%20process%20in%20bad%20faith (last visited Aug. 29, 2024).

[21] https://doc.mo.gov/media-center/newsroom/2021-in-review (last visited Aug. 29, 2024).

[22] https://www.centurionmanagedcare.com/newsroom/centurion-health-begin-correctional-health-contract-for-missouri-department-of-corrections.html (last visited Aug. 29, 2024).

> We are excited to partner with the Department of Corrections to bring Centurion's unique model of correctional healthcare to the people incarcerated in the state of Missouri. Providing innovative, high-quality healthcare to those who are incarcerated will not only serve them while they are in the facilities but also better prepare them for reentering Missouri communities.[23]

148. Centurion's mission statement makes clear that the company's business is to provide healthcare and behavioral health to incarcerated populations, and that inmates are the beneficiaries of its services: "Centurion is a leading national provider of healthcare and behavioral health services to incarcerated populations and judicially-involved individuals. Centurion is committed to improving the health of its patients and communities through compassionate care and innovative health solutions."[24]

149. Thus, inmates in the MODOC, including Mr. Pace prior to his death, are the intended beneficiaries of the services Centurion provides pursuant to the contract with the MODOC.

## V. CAUSES OF ACTION

### COUNT 1
### BREACH OF CONTRACT AS A THIRD-PARATY BENEFICIARY
### Against MODOC and Centurion

150. Plaintiff hereby incorporates paragraphs 1-149, as if fully set forth herein.

151. At the time of Mr. Pace's death, pursuant to a written contract, Centurion was the exclusive provider of medical services to inmates in MODOC custody such as Brandon Pace.

152. All inmates in MODOC custody, including Mr. Pace, are the intended third-party beneficiaries of the services Centurion provides pursuant to the contact with MODOC.

153. Both MODOC and Centurion breached that contract when Defendants' respective

---

[23] *Id.*
[24] *Id.*

agents and employees ignored and refused Mr. Pace mandated medical care when he claimed he could not breathe, needed help, and was objectively in medical distress for at least four hours.

154. Medical care was further mandated because the Correctional Officer Defendants believed that Mr. Pace had swallowed an illicit substance.

155. Plaintiff suffered injuries as a direct and proximate result of the above-mentioned breaches, including from pain, suffering, anguish, and mental and emotional distress prior to his death, and he ultimately lost his life because he was denied the necessary medical attention, monitoring, and care.

156. MODOC and Centurion are vicariously liable for the actions of the Correctional Officer Defendants and Medical Personnel Defendants, respectively, because they have the right and ability to control the actions of their agents.

157. MODOC does not have immunity from suit for breach of contract claims. MO. REV. STAT. § 537.600.

## COUNT 2
### 42 USC § 1983 (EXCESSIVE FORCE)
### Against the Correctional Officer Defendants

158. Plaintiff hereby incorporates paragraphs 1-149, as if fully set forth herein.

159. The Eighth Amendment to the United States Constitution, incorporated by the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishments. The Fourteenth Amendment prohibits the deprivation of life without due process of law.

160. The Correctional Officer Defendants have been or should have been trained in the use of OC spray.

161. Consistent with that training, OC spray should only be used in justifiable use of force situations, and that it should not be used to torture an inmate. OC should not be used at point-

blank range and only one or two quick bursts should be used. Spraying it directly in a victim's face and prolonged or repetitive spraying is not appropriate because such use poses a substantial danger to the victim. A riot-sized canister should not be used on an individual in a closed, confined space. Medical care is mandated if the victim is in obvious distress.

162. As alleged above, historically and to this day, MODOC tolerates and even turns a blind eye to the punitive, arbitrary, and malicious use of excessive force with the use of OC spray by correctional officers throughout its facilities.

163. Here, the Correctional Officer Defendants used excessive, unnecessary, and unconstitutional force against Brandon Pace when they sprayed him without justification at point-blank range with an excessive amount of OC spray and denied him medical attention thereafter, especially when he exhibited signs of distress.

164. The use of force against Mr. Pace was done maliciously and sadistically, constituted cruel and unusual punishment, was objectively unreasonable under the circumstances, and violated his constitutional rights, leading to his death.

165. By committing the acts complained of herein, the Correctional Officer Defendants acted under color of state law to deprive Mr. Pace of his constitutionally protected rights under the Eighth and Fourteenth Amendments.

166. As a direct and proximate result of the deprivation of his constitutional rights, Mr. Pace suffered the injuries and damages set out above.

167. Mr. Pace suffered severe physical, mental, and emotional distress prior to his death.

168. The unlawful conduct of Defendants was willful, malicious, and oppressive and was of such nature that punitive damages should be awarded.

169. Plaintiff seeks attorneys' fees and costs.

**COUNT 3**
**42 USC § 1983 (DELIBERATE INDIFFERENCE)**
**Against the Correctional Officer Defendants, the Medical Personnel Defendants, and Centurion**

170.     Plaintiff hereby incorporates paragraphs 1-149, as if fully set forth herein.

171.     The Eighth Amendment to the United States Constitution, incorporated by the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishments. The Fourteenth Amendment prohibits the deprivation of life without due process of law.

172.     The Correctional Officer Defendants and Medical Personnel Defendants have been or should have been trained that any inmate swallowing an unknown substance believed to be an illicit substance must be attended to by medical personnel and/or taken to the medical unit.

173.     The Correctional Officer Defendants and Medical Personnel Defendants have been trained or should have been trained to render aid in emergency situations and/or to request medical assistance from trained medical personnel if an inmate exhibits objective signs of distress.

174.     By committing the acts complained of herein, including failing to provide medical attention for Mr. Pace after the Correctional Officer Defendants believed he swallowed an illicit substance and ignoring Mr. Pace's pleas for medical assistance, the Correctional Officer Defendants and Medical Personnel Defendants acted with deliberate indifference to Brandon Pace's serious medical needs.

175.     Mr. Pace's medical needs were objectively serious because he exhibited outwards signs of distress and begged for help for over four hours, saying that he could not breathe and that he needed help.

176.     Those Defendants knew of Mr. Pace's medical needs because of, among other things, his pleas and requests for help and assistance, saying that he needed help and couldn't breathe.

35

177.    The Correctional Officer Defendants and Medical Personnel Defendants acted under color of state law to deprive Mr. Pace of his constitutionally protected rights under the Eighth and Fourteenth Amendments.

178.    Defendant Centurion is vicariously liable for the actions of the Medical Personnel Defendants because it has the right and ability to control the actions of their agents, employees, and independent contractors.

179.    As a direct and proximate result of the deprivation of his constitutional rights, Mr. Pace suffered the injuries and damages set out above, leading to his death.

180.    Mr. Pace suffered severe physical, mental, and emotional distress prior to his death.

181.    The unlawful conduct of Defendants was willful, malicious, and oppressive and was of such nature that punitive damages should be awarded.

182.    Plaintiff seeks attorneys' fees and costs.

## COUNT 4
### 42 USC § 1985(3) (CIVIL RIGHTS CONSPIRACY)
**Against Precythe, Foley, Sturm, Moseley, Terry, Briesacher, and Van Loo in their Individual Capacities, Correctional Officer Defendants, Medical Personnel Defendants, and Centurion**

183.    Plaintiff hereby incorporates paragraphs 1-149, as if fully set forth herein.

184.    The Eighth Amendment to the United States Constitution, incorporated by the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishments. The Fourteenth Amendment prohibits the deprivation of life without due process of law.

185.    Upon information and belief, the Defendants agreed among themselves and with other individuals to act in concert and with the intent to deprive Mr. Pace of his clearly established rights, including but not limited to his right to be free from cruel and unusual punishment and his right to life.

36

186. This includes, but is not limited to, the fact that the MODOC and its supervisors at the highest levels have turned a blind eye regarding correctional officers' use of force and specifically, has tolerated the use of OC spray for sadistic and improper purposes.

187. In furtherance of the conspiracy Defendants engaged in and facilitated numerous overt acts, including but not limited to: using excessive force against Mr. Pace when it was not warranted; using OC spray at point-blank range; using a riot-sized canister of OC spray on Mr. Pace in a confined space; dousing Mr. Pace in an excessive amount of OC spray; refusing him medical attention thereafter despite his repeated requests for medical aid and the requests of other inmates around him who could hear his pain and agony; submitting false statements to hide their malfeasance; threatening other inmates for discussing the events that led to Mr. Pace's death; and refusing to produce documents to Plaintiff regarding the events leading to Mr. Pace's death.

188. Defendant Centurion is vicariously liable for the actions of the Medical Personnel Defendants because it has the right and ability to control the actions of their agents, employees, and independent contractors.

189. Defendants Precythe, Foley, Sturm, Moseley, Terry, Briesacher, and Van Loo ratified the actions of the Correctional Officer Defendants by engaging in a cover-up regarding the events and denying Plaintiff access to information regarding Mr. Pace's death.

190. As a direct and proximate result of the deprivation of his constitutional rights, Mr. Pace suffered the injuries and damages set out above, leading to his death.

191. Mr. Pace suffered severe physical, mental, and emotional distress prior to his death.

192. The unlawful conduct of Defendants was willful, malicious, and oppressive and was of such nature that punitive damages should be awarded.

193. Plaintiff seeks attorneys' fees and costs.

# COUNT 5
## 42 USC § 1983 (*MONELL* - UNCONSTITUTIONAL POLICIES, CUSTOMS, AND PRACTICES)
### Against MODOC, Precythe, Foley, Sturm, Moseley, Terry, Briesacher, and Van Loo in their Official Capacities, Correctional Officer Defendants, Medical Personnel Defendants, and Centurion

194. Plaintiff hereby incorporates paragraphs 1-149, as if fully set forth herein.

195. The Eighth Amendment to the United States Constitution, incorporated by the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishments. The Fourteenth Amendment prohibits the deprivation of life without due process of law.

196. Defendants MODOC, Precythe, Foley, Sturm, Moseley, Terry, Briesacher, and Van Loo adopted, implemented, and/or enabled the following unconstitutional policies, customs, and/or practices:

   a. Tolerating and turning a blind eye to the punitive, arbitrary, and malicious use of excessive force with OC spray by correctional officers throughout its facilities, including at Tipton;

   b. Continued use of force of OC spray after an inmate becomes compliant;

   c. Authorizing the use of force in circumstances where force was not warranted;

   d. Using a riot-sized canister on an individuals in confined spaces;

   e. Refusing to call for or provide medical attention for an inmates who request same;

   f. Refusing to call for or provide medical attention for inmates who objectively need medical attention;

   g. Refusing to call for or provide life-saving medical attention;

   h. Directing medical personnel not to attend to an inmate in need of medical attention;

38

i. Ignoring an inmate's need for medical attention by allowing the inmate to suffer, linger, and die;

j. Ignoring policies in place for the proper use of OC spray, and providing attention thereafter;

k. Failing to provide medical care for inmates in need of same;

l. Tolerating and allowing the abuse and neglect of inmates in need of medical attention;

m. Conspiring with each other and the Centurion Defendants to deprive inmates of needed medical care and attention; and

n. Covering up incidents involving deaths in custody, the unauthorized use of force, and the improper denial of medical treatment and care.

197. Defendants Centurion and the Medical Personnel Defendants, who were performing an essential governmental function for § 1983 purposes, adopted, implemented, and/or enabled the following policies, customs, and/or practices:

a. Refusing to provide medical attention for inmates who request same;

b. Refusing to provide medical attention for inmates who objectively need medical attention;

c. Refusing to provide life-saving medical attention;

d. Taking direction from correctional officers regarding an inmate medical needs;

e. Ignoring an inmate's need for medical attention by allowing the inmate to suffer, linger, and die;

f. Failing to provide medical care for inmates in need of same;

g. Tolerating and allowing the abuse and neglect of inmates in need of medical

attention; and

h. Conspiring with each other and the MODOC Defendants to deprive inmates of needed medical care and attention.

198. The Defendants' customs and policies created a substantial risk of harm to inmates at the Tipton Correctional Center, including Mr. Pace, and Defendants were aware of that risk.

199. Defendants Precythe, Foley, Sturm, Moseley, Terry, Briesacher, and Van Loo ratified the actions of the Correctional Officer Defendants by engaging in a cover-up regarding the events and denying Plaintiff access to information regarding Mr. Pace's death.

200. Defendant Centurion is vicariously liable for the actions of the Medical Personnel Defendants because it has the right and ability to control the actions of their agents, employees, and independent contractors.

201. As a result of Defendants' unconstitutional policies, customs, and practices, Mr. Pace suffered, lingered, and died without proper medical care and attention.

202. Mr. Pace suffered severe physical, mental, and emotional distress prior to his death.

203. The unlawful conduct of Defendants was willful, malicious, and oppressive and was of such nature that punitive damages should be awarded.

204. Plaintiff seeks attorneys' fees and costs.

**COUNT 6**
**42 USC § 1983 (*MONELL* – FAILURE TO TRAIN OR SUPERVISE)**
**Against MODOC, Precythe, Foley, Sturm, Moseley, Terry, Briesacher, and Van Loo in**
**their Official Capacities, Correctional Officer Defendants, Medical Personnel Defendants,**
**and Centurion**

205.     Plaintiff hereby incorporates paragraphs 1-149, as if fully set forth herein.

206.     The Eighth Amendment to the United States Constitution, incorporated by the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishments. The Fourteenth Amendment prohibits the deprivation of life without due process of law.

207.     Historically and to this day, the MODOC tolerates and turns a blind eye to the punitive, arbitrary, and malicious use of excessive force with OC spray by correctional officers throughout its facilities. This was an unconstitutional pattern and practice.

208.     Defendants were aware of the policies, customs, and practices as alleged above in Count 5, and were aware that said policies, customs, and practices created a substantial risk of causing harm and did harm inmates at the Tipton Correctional Center, including Mr. Pace.

209.     Despite their knowledge, Defendants were deliberately indifferent to and/or allowed, approved of, and ratified said policies, customs, and practices.

210.     Defendants failed to adequately train Correctional Officer Defendants regarding the use of force. Defendants were aware that their failure to train created a substantial risk of causing harm to inmates at the Tipton Correctional Center, including Mr. Pace.

211.     Defendants failed to adequately train Correctional Officer Defendants and Medical Personnel Defendants, respectively, regarding the need to provide medical attention for an inmate exhibiting medical distress; medical observation for any inmate taking an unknown substance; medical attention for any inmate requesting it; and medical attention when it is objectively needed. Defendants were aware that their failure to train created a substantial risk of causing harm to

41

inmates at the Tipton Correctional Center, including Mr. Pace.

212. Defendants failed to properly supervise Correctional Officer Defendants and Medical Personnel Defendants, respectively, resulting in the abuse, neglect, and damages alleged herein leading to Mr. Pace's otherwise avoidable death. Defendants were aware that their failure to supervise created a substantial risk of causing harm to inmates at the Tipton Correctional Center, including Mr. Pace.

213. As a direct result of the above-named Defendants' actions and inactions, Mr. Pace was harmed and thereafter not provided any medical care despite his obvious need, ultimately leading to his death.

214. As a result of Defendants' allowance, approval, and ratification of said policies, customs, and practices, Mr. Pace was deprived of necessary life-saving medical attention and died unnecessarily.

215. Mr. Pace suffered, lingered, and died without proper medical care and attention.

216. Defendants Precythe, Foley, Sturm, Moseley, Terry, Briesacher, and Van Loo ratified the actions of the Correctional Officer Defendants by engaging in a cover-up regarding the events and denying Plaintiff access to information regarding Mr. Pace's death.

217. Defendant Centurion is vicariously liable for the actions of the Medical Personnel Defendants because it has the right and ability to control the actions of their agents, employees, and independent contractors.

218. Mr. Pace suffered severe physical, mental, and emotional distress prior to his death.

219. The unlawful conduct of Defendants was willful, malicious, and oppressive and was of such nature that punitive damages should be awarded.

220. Plaintiff seeks attorneys' fees and costs.

## COUNT 7
**42 USC § 1983 (DEPRIVATION OF COMPANSIONSHIP AND SOCIETY)**
**Against the Correctional Officer Defendants, Medical Personnel Defendants, and**
**Centurion**

221.    Plaintiff hereby incorporates paragraphs 1-149, as if fully set forth herein.

222.    This claim is brought by Plaintiff Tammy Reed to vindicate her individual rights.

223.    The Fourteenth Amendment prohibits the deprivation of life without due process of law. Plaintiff Tammy Reed, as the mother of Brandon Pace, has a constitutionally protected liberty interest in the companionship and society of her son.

224.    The above-named Defendants acted with deliberate indifference to Plaintiff's constitutionally protected liberty interest and deprived Plaintiff of the love, society, and companionship of her son by the acts and omissions described above.

225.    Defendant Centurion is vicariously liable for the actions of the Medical Personnel Defendants because it has the right and ability to control the actions of their agents, employees, and independent contractors.

226.    As a direct and proximate result of the deprivation of her constitutional rights, Plaintiff has suffered economic and non-economic injuries caused by Mr. Pace's death.

227.    The unlawful conduct of Defendants was willful, malicious, and oppressive and was of such nature that punitive damages should be awarded.

228.    Plaintiff seeks attorneys' fees and costs.

## COUNT 8
**ASSAULT AND BATTERY**
**Against the Correctional Officer Defendants**

229.    Plaintiff hereby incorporates paragraphs 1-149, as if fully set forth herein.

230.    As alleged herein, Defendants intended to and did cause bodily harm and offensive contact without justification under the circumstances.

43

231. Mr. Pace was in apprehension of and suffered bodily harm and offensive contact without justification.

232. Defendants acted with reckless or callous indifference and conscious disregard for the safety and life of Mr. Pace and intended to and did cause bodily harm and offensive contact without justification.

233. As a direct and proximate result of the actions and omissions by Defendants, as alleged above, Brandon Pace was injured, leading to his death.

234. Defendants' conduct set forth in this Complaint, which was reckless and/or callously indifferent to Mr. Pace's rights, constitutes aggravating circumstances within the meaning of the laws of the State of Missouri.

## COUNT 9
### LOST CHANCE OF RECOVERY AND SURVIVAL UNDER Mo. Rev. Stat. § 537.020
### Against Precythe, Foley, Sturm, Moseley, Terry, Briesacher, and Van Loo in their
### Individual Capacities, Correctional Officer Defendants, Medical Personnel Defendants,
### and Centurion

235. Plaintiff hereby incorporates paragraphs 1-149, as if fully set forth herein.

236. As alleged herein, Defendants failed to meet the standard of care applicable to correctional administrators, correctional officers, and medical personnel working in a correctional facility.

237. Defendants were negligent in their actions and omissions, as alleged herein.

238. Defendants acted with reckless or callous indifference and conscious disregard for the safety and life of Mr. Pace.

239. As a direct and proximate result of the actions and omissions by Defendants, Brandon Pace was injured and caused to suffer conscious pain.

240. Plaintiff, as next-of-kin of Brandon Pace, is therefore entitled to recover damages

against Defendants pursuant to MO. REV. STAT. § 537.020 pain and suffering inflicted on Brandon Pace by Defendants prior to his death.

241. Defendants Precythe, Foley, Sturm, Moseley, Terry, Briesacher, and Van Loo ratified the actions of the Correctional Officer Defendants by engaging in a cover-up regarding the events and denying Plaintiff access to information regarding Mr. Pace's death.

242. Defendant Centurion is vicariously liable for the actions of the Medical Personnel Defendants because it has the right and ability to control the actions of their agents, employees, and independent contractors.

243. As a result of Defendants' actions and omissions, Mr. Pace lost a chance of recovery and survival.

244. Defendants' conduct set forth in this Complaint, which was reckless and/or callously indifferent to Mr. Pace's rights, constitutes aggravating circumstances within the meaning of the laws of the State of Missouri.

## <u>COUNT 10</u>
### WRONGFUL DEATH UNDER MO. REV. STAT. § 537.080
### Against Precythe, Foley, Sturm, Moseley, Terry, Briesacher, and Van Loo in their Individual Capacities, Correctional Officer Defendants, Medical Personnel Defendants, and Centurion

245. Plaintiff hereby incorporates paragraphs 1-149, as if fully set forth herein.

246. As alleged herein, Defendants failed to meet the standard of care applicable to correctional administrators, correctional officers, and medical personnel working in a correctional facility.

247. Defendants were negligent in their actions and omissions, as alleged herein.

248. Defendants acted with reckless or callous indifference and conscious disregard for the safety and life of Mr. Pace.

45

249. As a direct and proximate result of the actions and omissions by Defendants, Brandon Pace was injured, caused to suffer conscious pain, and ultimately loss of life.

250. Plaintiff, as Brandon Pace's mother, is therefore entitled to recover damages against Defendants pursuant to MO. REV. STAT. § 537.080 for the wrongful death of Brandon Pace.

251. Defendants Precythe, Foley, Sturm, Moseley, Terry, Briesacher, and Van Loo ratified the actions of the Correctional Officer Defendants by engaging in a cover-up regarding the events and denying Plaintiff access to information regarding Mr. Pace's death.

252. Defendant Centurion is vicariously liable for the actions of the Medical Personnel Defendants because it has the right and ability to control the actions of their agents, employees, and independent contractors.

253. Defendants' conduct set forth in this Complaint, which was reckless and/or callously indifferent to Mr. Pace's rights, constitutes aggravating circumstances within the meaning of the laws of the State of Missouri.

## COUNT 11
### SUNSHINE LAW VIOLATION
**Against MODOC, and Precythe, Foley, Sturm, Moseley, Terry, Briesacher, and Van Loo in their Individual Capacities**

254. Plaintiff hereby incorporates paragraphs 1-149, as if fully set forth herein.

255. This claim is brought by Plaintiff Tammy Reed, individually.

256. On April 12, 2023 and October 5, 2023, with follow up communications sent on May 2, 2023, June 1, 2023, July 18, 2023, September 7, 2023 and April 30, 2023, Plaintiff made statutorily compliant requests for access to public records regarding Mr. Pace's death.

257. Defendant MODOC, through its legal department, including but not limited to Defendant Briesacher, acknowledged receipt of Plaintiff's requests with responsive emails, promises of future production, and production of unimportant, historical documents.

46

258.    At no time did MODOC contend that Plaintiff's requests were not compliant with the law.

259.    Defendants MODOC, Precythe, Foley, Sturm, Moseley, Terry, Briesacher, and Van Loo knowingly and willfully refused to produce documents and information pursuant to Plaintiff's statutorily compliant requests seeking documents regarding the events leading to Brandon Pace's death.

260.    Plaintiff seeks civil monetary penalties and attorneys' fees and costs for Defendants' knowing violations of the Sunshine Law. MO. REV. STAT. § 610.027.3, .4.

## VI.    PRAYER FOR RELIEF

261.    Plaintiff demands a trial by jury for all issues so triable.

**WHEREFORE,** Plaintiff as set forth in each claim prays for judgment against Defendants as follows:

A.    That Plaintiff's and Brandon Pace's constitutionally protected rights were violated to their detriment;

B.    For compensatory damages in an amount to be determined by the jury, together with prejudgment interest thereon;

C.    For punitive damages to the extent allowable by law;

D.    For Plaintiff's attorney's fees to the extent allowable by law;

E.    For civil penalties for violations of the Sunshine Law to the extent allowable by law;

F.    For Plaintiff's costs and disbursements incurred herein; and

G.    For such other and further relief as this Court deems just and proper.

Dated: September 5, 2024

Respectfully submitted,

By: */s/: Thomas J. Porto*
Thomas J. Porto, #59716
The Popham Law Firm
712 Broadway Blvd., #100
Kansas City, MO 64105
Ph: (816) 221-2288
Fax: (816) 221-3999
tporto@pophamlaw.com

and

Lynn A. Ellenberger, Esq.
To be admitted Pro Hac Vice
FEGAN SCOTT LLC
322 North Shore Drive
Building B1, Ste. 200
Pittsburgh, PA 15212
Ph: (412) 346-4104
Fax: (312) 264-0100
lynn@feganscott.com
**Attorneys for Tammy Reed**