# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### JEFFERSON CITY DIVISION

| | |
|---|---|
| TAMMY REED,<br><br>Plaintiff,<br><br>v.<br><br>MISSOURI DEPARTMENT OF CORRECTIONS, et al.,<br><br>Defendants. | Case No.: 2:24-cv-04152-BCW |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO THE CENTURION DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................ 1

II.  SUMMARY JUDGMENT STANDARD.......................................................... 2

III.  ARGUMENT.................................................................................................... 3

  A.  Genuine issues of material fact preclude summary judgment where Centurion was deliberately indifferent to Brandon's serious medical need resulting in his death (Counts 4 and 8). ....................................................................................... 3

    1.  Brandon had a serious medical need, after ingesting a suspected lethal amount of drugs, being doused in Riot Pepper Spray, and being left face down in his cell with his waist restraint around his chest. .................................................. 4

    2.  The Centurion Defendants knew that Brandon had a serious medical need but deliberately disregarded it.................................................................... 8

    3.  Genuine issues of material fact exist where video shows that medical staff failed to provide essential and basic care to Brandon, and where they falsified the medical records to cover their lack of care. ............................................... 8

  B.  Genuine issues of material fact preclude summary judgment on Plaintiff's *Monell* claims (counts 6 and 7) ........................................................................................ 13

    1.  Centurion adopted and implemented MDOC's policies................................. 13

    2.  Centurion deliberately or recklessly failed to train its medical staff to provide necessary medical care (Count 7). ................................................................. 15

  C.  Defendants acknowledge that Brandon is a class of one, and genuine issues of material fact exist regarding Plaintiff's Equal Protection claim (Count 5). ..................... 17

  D.  Questions of fact exist as to whether Brandon Pace is a third-party beneficiary to the Centurion-MDOC contract for the provision of medical care to inmates. ....................... 19

  E.  Centurion of Missouri, LLC and MHM Services, Inc. are not shielded from liability for Plaintiff's state law claims (Counts 10 and 11). ........................................................ 21

  F.  The evidence demonstrates that the Centurion Defendants' actions were a substantial cause of Brandon's death, precluding summary judgment on Counts 4, 8, 10 and 11..... 23

  G.  The record supports Plaintiff's demand for punitive damages. ................................. 24

IV.  CONCLUSION................................................................................................. 26

i

Case 2:24-cv-04152-BCW     Document 265     Filed 04/03/26     Page 3 of 30

## I.    INTRODUCTION

The United States Constitution does not permit prison officials or their medical contractors to ignore an incarcerated person's obvious and serious medical needs. The Eighth Amendment guarantees inmates the right to necessary medical care and forbids deliberate indifference to conditions posing a substantial risk of serious harm. That protection is especially important where, as here, a prisoner is wholly dependent on prison and medical staff for recognition of a medical emergency, access to treatment, and the most basic measures necessary to preserve life. This case arises from the alleged denial of those constitutional protections.

The Centurion Defendants[1] seek summary judgment on Plaintiff's federal and state-law claims arising from Brandon Pace's death while in custody at Tipton Correctional Center, but that motion should be denied. The evidence presents numerous genuine disputes of material fact regarding Brandon's medical condition, what Centurion personnel knew about that condition, what care they provided and failed to provide, whether Centurion's policies and training failures caused the violations alleged, and whether Defendants' conduct substantially caused Brandon's death. These are jury questions, not issues that may be resolved as a matter of law.

As to Counts 4 and 8, a reasonable jury could find that Brandon had an objectively serious medical need after ingesting a suspected lethal-dose of methamphetamine, being sprayed with a riot-sized can of oleoresin capsicum (OC) in a confined dry cell, and exhibiting obvious and escalating distress over a period of hours. The record would further permit a jury to find that Centurion medical personnel knew of those circumstances yet failed to implement overdose protocols, failed to perform basic assessment and vital signs, failed to provide adequate

---

[1] The Centurion Defendants are defined to include Centurion of Missouri, LLC, MHM Services, Inc., Anna Mefford, LPN, Robin Behr, RN, MSN, Kristy Gaines, RN, Cara Conner, LPN, and Nicole Townsend, LPN.

1

decontamination, failed to monitor Brandon appropriately, and failed to escalate his care to a hospital. On this record, summary judgment is improper on Plaintiff's deliberate-indifference claims and on causation.

Summary judgment is likewise inappropriate on Plaintiff's *Monell* claims in Counts 6 and 7. Plaintiff has adduced evidence from which a jury could find that Centurion adopted and implemented MDOC policies but failed to train and supervise its staff on critical policies, including overdose response, dry-cell monitoring, and OC-spray decontamination. The evidence shows nursing staff failed to follow critical protocols or the standard of care in the treatment of Brandon, yet covered up their lack of care through false medical charting which materially conflicts with contemporaneous video. A reasonable jury could conclude that the constitutional violations alleged were caused by Centurion's policies, customs, or deliberately indifferent training failures, rather than by isolated mistake.

Count 5 also survives because factual disputes remain regarding Plaintiff's class-of-one Equal Protection claim. The same is true of Plaintiff's claim that Brandon was a third-party beneficiary of the Centurion-MDOC contract for inmate medical care, as well as Plaintiff's Missouri wrongful death and related state-law claims against Centurion of Missouri, LLC and MHM Services, Inc. In addition, the record would permit a reasonable jury to award punitive damages. Because genuine disputes of material fact pervade Plaintiff's claims, the Centurion Defendants' motion should be denied in its entirety.

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

2

(1986). All evidence must be viewed in the light most favorable to the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is inappropriate where reasonable minds could differ as to the importance of the evidence. *See id*. at 250-51. When the parties present competing expert testimony on critical issues of standard of care and causation, summary judgment should be denied. *See Dulany v. Carnahan*, 132 F.3d 1234, 1244 (8th Cir. 1997).

## III.  ARGUMENT

### A.  Genuine issues of material fact preclude summary judgment where Centurion was deliberately indifferent to Brandon's serious medical need resulting in his death (Counts 4 and 8).

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Johnson v. Leonard*, 929 F.3d 569, 575 (8th Cir. 2019) (alteration in original) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). The failure to provide proper medical care violates the Eighth Amendment when a medical provider is "deliberately indifferent to the prisoner's serious medical needs." *Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 795 (8th Cir. 2006) (citing *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)). "[I]t is well settled that providing no medical care in the face of a serious health risk constitutes deliberate indifference." *Ortiz v. City of Chicago*, 656 F.3d 523, 538 (7th Cir. 2011) (reversing the grant of summary judgment where the "claim is that each of the defendants knew that [the arrestee] suffered from a serious medical condition, yet they failed to take any step in response").  To prevail on an Eighth Amendment claim of deliberate indifference to serious medical needs, a plaintiff must establish two elements: (1) an objectively serious medical need, and (2) that prison officials actually knew of but deliberately disregarded that need. *See Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011).

3

**1. Brandon had a serious medical need, after ingesting a suspected lethal amount of drugs, being doused in Riot Pepper Spray, and being left face down in his cell with a waist restraint around his chest.**

A medical need is "serious" when it "has been diagnosed by a physician as requiring treatment or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 795 (8th Cir. 2006) (citation omitted). Here, Brandon's serious medical need was obvious to multiple witnesses: the correctional officer who reported that Brandon swallowed what he suspected was a lethal dose of methamphetamine. ¶¶ 58, 87, 89;[2] the Centurion nurses who were called to treat Brandon after he was doused with Riot Pepper Spray but failed to take his vital signs over 7 hours. ¶¶ 177-179, 226-227; and the nurses and officers who observed Brandon's inability to stand or move, and his nearly-lifeless body lying face down while restrained. ¶¶ 120-121, 122-125, 129-130, 205, 228, 233-236. Even other prisoners recognized Brandon's distress, listening to his hours of calls for help and moaning. ¶¶ 109-111. Defendants' argument that Brandon did not display symptoms of methamphetamine toxicity until 9:40 p.m. is contradicted by the weight of the evidence and is a gross continuation of their disregard for human life.

Plaintiff's expert Dr. Hughes opined, with a reasonable degree of medical certainty, that Brandon was suffering from an objectively serious medical condition. ¶¶ 258, 260. Specifically, Dr. Hughes observed that Brandon exhibited signs of severe stimulant toxicity—including extreme agitation, sweating, and worsening distress—symptoms that were clearly visible on the video footage. ¶ 260. Dr. Hughes explained that Brandon's condition was deteriorating, and that the risks from methamphetamine intoxication, including hyperthermia, dehydration, heart rhythm problems, excited delirium, and rhabdomyolysis, can be sudden and deadly. ¶¶ 260, 276.

---

[2] All citations to "¶¶__" are to Plaintiff's Statement of Material Facts submitted herewith.

4

Accordingly, Dr. Hughes concluded that Brandon's condition warranted prompt transfer to a hospital, where his condition was treatable and death was not a foregone conclusion. ¶ 261.

"When the inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment." *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (internal quotation marks, emphasis, and citation omitted). "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that these delays adversely affected his prognosis." *Redmond v. Kosinski*, 999 F.3d 1116, 1121 (8th Cir. 2021) (quoting *Holden v. Hirner*, 663 F.3d 336,342 (8th Cir. 2011)).  Here, that delay is obvious – it resulted in Brandon's death. Centurion knew that Brandon ingested methamphetamine, which the observing officer believed to be lethal (acute), ¶¶ 58, 87-90, 182, 225, 259 and then delayed for hours while Brandon's condition deteriorated to the point he was not moving face down in the cell (escalating), ¶¶ 205, 228, 233, 289. The Centurion Defendants ignored the situation, failing to even take Brandon's vitals (as shown on video), while at the same time falsifying the medical records to cover their tracks. ¶¶ 76, 160, 177-179, 226-227, 270. Dr. Hughes explained that "the unnecessary delay in definitive care and failure to adequately assess and act on the methamphetamine use, facts known by the defendants, led to his worsening medical and psychiatric condition." ¶ 293.

The cases Defendants rely on are distinguishable. In *Starks v. St. Louis County,* the impaired inmate showed symptom improvement over time, not the extreme deterioration Brandon exhibited. 159 F.4th 1146, 1149 (8th Cir. 2025). In *Grayson v. Ross*, the officer did not witness the plaintiff ingest drugs, and the plaintiff's behavior did not suggest a high degree of intoxication. 454 F.3d 802, 810 (8th Cir. 2006). In *Reece v. Hale*, the officer did not think the

plaintiff's condition was particularly serious and the plaintiff was able to converse. 58 F.4th 1027, 1030 (8th Cir. 2023). Here, by contrast, a correctional officer witnessed Brandon ingest a baggie of suspected methamphetamine and reported this to Centurion. Correctional officers and Centurion Defendants then observed Brandon's extreme behavior and rapid deterioration, reflecting a high degree of intoxication, until he was face down and lifeless.

This case is more akin to cases where the defendants did not receive qualified immunity. For example, in *Thompson v. King*, an arrestee passed out in the booking area and nearly fell out of his seat. He was too intoxicated to sign any forms or answer questions. The officer then ignored another detainee's warning that the arrestee needed help. 730 F.3d 742, 749-50 (8th Cir. 2013). Those facts are nearly the same here: Brandon couldn't stand or sit, ultimately laying face down in his cell. ¶¶ 134, 205, 210, 228, 233. He couldn't coherently or intelligibly answer the Defendants' questions, or put on the prison jumpsuit. ¶¶ 120-121, 123-125, 128-130, 134. He was visibly in distress, and repeatedly said he could not breathe. ¶ 112.

In another example, in *Barton v. Taber*, the court held that the plaintiff demonstrated a serious medical need where the defendant saw the plaintiff collapse and observed that the plaintiff could not understand defendant's instructions. The court explained:

> Despite knowing that [plaintiff] had been in a car accident, that he had symptoms of severe intoxication, and that he could not answer her questions about his medical needs, [the deputy defendant] did not conduct the healthcare screening that the County's policies require and which would have revealed significant bruising on [plaintiff's] back and legs.

908 F.3d 1119, 1124-25 (8th Cir. 2018). Like in *Barton,* Defendants witnessed Brandon with severe intoxication symptoms (and knew that he had ingested suspected methamphetamine), were called to decontaminate him after he was doused in Riot Pepper Spray, witnessed his extreme intoxication and distress, and did not conduct the healthcare screening required by their

6

protocols or the standard of care. Under those circumstances, a jury could find that Brandon was experiencing a medical need so obvious that a layperson would recognize that he needed prompt medical attention. *Id.* at 1124.

Further, Brandon's deteriorating condition was compounded by the Riot Pepper Spray, a circumstance not present in the cases cited by Defendants. Despite the fact that Brandon requested a shower (given that his face, torso, and arms were covered), a nurse arrived to treat him without any supplies. After delay, the nurses returned with some gauze and water, but only touched up his face, which would not treat the persistent effects elsewhere. ¶¶156-58, 169-172.

Defendants cite *Jones v. Minnesota Dept. of Corrections*, 512 F.3d 478, 483 (8th Cir. 2008), for the proposition that "[a] medical condition is not *per se* obvious to a layperson because it later results in death." But this argument misses the mark. Plaintiff does not contend that Brandon's death alone demonstrates seriousness. Rather, the *combination* of known methamphetamine ingestion, OC spray exposure, visible distress, and deterioration over hours created an objectively obvious medical emergency—a conclusion supported by expert testimony that the condition warranted immediate medical intervention. As Dr. Hughes testified: "any person medical or non-medical that watches that 7, 8 hours of video and doesn't think that man belongs in a hospital is off-kilter. This man clearly was visibly in horrific distress." ¶ 260. Brandon "was suffering from an objectively serious medical condition," "the medical care provided to Brandon Pace while in custody of TCC was substandard," and his "untimely death . . . was more likely than not preventable." ¶ 291.

Thus, a reasonable jury could find that Brandon's condition was so obvious that even a layperson would recognize the need for escalated medical attention. The evidence in this case presents precisely the type of "sufficient disagreement" that requires "submission to a jury."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

> **2.** **The Centurion Defendants knew that Brandon had a serious medical need but deliberately disregarded it.**

The Centurion Defendants do not dispute that they were told that (i) Brandon had taken methamphetamine before going to Administrative Segregation,¶¶ 259, 262. (ii) Brandon swallowed a baggie of suspected methamphetamine while in segregation, ¶¶ 225, 259, 262; (iii) Brandon was sprayed with Riot Pepper Spray, ¶¶ 161-162, 165, 169-171, 173-174; and (iv) Brandon was wearing arm, leg, and waist restraints, ¶ 159. The Centurion Defendants also do not dispute that the nurses observed Brandon unable to stand without wobbling, sit up, or coherently respond to their directions, and further observed that his conduct deteriorated to the point he was laying face down in his cell. ¶¶ 228-229.

The Centurion Defendants' claim that they did not know the condition was "serious" until just before Brandon was pronounced dead should be rejected. "Viewing the facts in the light most favorable to [plaintiff], a jury could infer [the Centurion Defendants'] knowledge by [Brandon's] evident need for prompt medical attention and [Defendants'] obviously inadequate response to that need." *Barton*, 908 F.3d at 1125 (citing *Barton v. Taber*, 820 F.3d, 958 965 (explaining that a defendant's mental state can be inferred from evidence "that demonstrate[s] that a medical need was obvious and that the [official's] response was 'obviously inadequate'" (quoting *Thompson v. King*, 730 F.3d 742, 747))). The question of what the Centurion Defendants knew or should have known based on seven-plus hours of video evidence is for the jury.

> **3.** **Genuine issues of material fact exist where video shows that medical staff failed to provide essential and basic care to Brandon, and where they falsified the medical records to cover their lack of care.**

Dr. Hughes's opinions describe conduct reflecting conscious disregard of Brandon's needs—the subjective component of the deliberate indifference standard, stating:

• "The disregard for Brandon's wellbeing for hours on end is appalling, as not even the bare minimum in care standards were met while he suffered in a cell for hours." ¶ 289.

• The nursing evaluations were "grossly insufficient" and the care was "substandard" and "appalling." ¶ 271.

• The delayed treatment "approximately 30 minutes after the application of OC spray is further evidence of an indifference to his suffering." ¶ 285.

• LPN Conner's "abbreviated evaluation of Brandon and the fact that she left him lying face down on the cell floor show a disregard for Brandon's safety, wellbeing and serious medical condition." ¶ 289.

• "Brandon's condition and suffering clearly warranted prompt transfer to a hospital equipped to manage his clinical needs" and "recovery would in all likelihood have been the ultimate outcome with a reasonable degree of medical certainty" had timely care been provided. ¶ 292.

• "The care provided was not 'we checked him and he was okay.' It was **inadequate assessment, delayed escalation, and an unsafe response** to a high-risk situation. Evidenced by outcome." ¶ 294. (emphasis in original).

These opinions describe the precise conduct that the Eighth Circuit has held constitutes deliberate indifference: "Medical care so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Smith v. Jenkins,* 919 F.2d 90, 93 (8th Cir. 1990).

Defendants argue that each individual nurse's conduct was appropriate, using subjective adjectives like "gently wash" and "carefully assess" to describe the nurses' care. Def. Mem. at 21. First, such descriptions are not undisputed material facts.[3] Second, Defendants mischaracterize the facts. While the adjectives and adverbs are disputed, "gently wash[ing]" Brandon's face with saline while the nurse coughed in the confined cell was not sufficient

---

[3] *Series 15-09-321 v. State Farm Mut. Auto. Ins. Co.*, No. 1:23-CV-22982, 2025 U.S. Dist. LEXIS 137584, *7 n.2 (S.D. Fla. July 15, 2025) (noting the court "will disregard…unnecessary adjectives alleged to be undisputed material facts."); *St. of Colo. ex rel. Weiser v. Corp. Certificates LLC*, No.25-CV-32544, 2025 Colo. Dist. LEXIS 4613, *6 (D. Colo. July 18, 2025) ("The movant must avoid adding unnecessary adjectives or adverbs to his or her material facts. In general, the Court finds such descriptors vague and unhelpful to adjudicate summary judgment motions.").

9

decontamination where his torso and arms were also covered. Likewise, "carefully assess[ing]" is a gross exaggeration where the nurses never even took Brandon's basic vital signs. ¶¶ 177-179, 226-227.

Dr. Hughes addressed each individual Defendant's conduct: Dr. Hughes noted that Dr. Lovelace was notified by a nurse of Brandon's medical situation, but Dr. Lovelace apparently gave no directives and none were documented. ¶ 262. Dr. Hughes opined that this lack of documented physician response is part of the broader failure in communication and treatment that contributed to Brandon's deterioration and death. ¶ 263.

Dr. Hughes characterized Nurse Mefford's initial segregation evaluation as "cursory at best." ¶ 264. The medical record omitted Brandon's two prior suicide watches at MDOC; despite policy requiring urgent mental health consultation in such cases, none occurred. ¶ 265. Dr. Hughes described all of the nursing failures as "basic and serious," citing the lack of meaningful clinical assessment, failure to take vital signs, or hands-on examination. ¶ 266. Dr. Hughes explained that Nurse Gaines cleared MDOC staff to use OC spray on Brandon, despite methamphetamine-impairment which raised the risk for an adverse outcome, and without documenting the decision. ¶ 268. He opined that Nurse Gaines, and other medical staff, should have recommended against the use of OC spray. ¶ 269.

Dr. Hughes also identified significant discrepancies between the medical documentation and the video evidence. While Nurse Mefford documented that Brandon was "alert and oriented x 4," this was "clearly untrue based on video as Pace was severely impaired." ¶ 270. She documented that capillary refill was "<3 seconds," yet "this was not checked per video." ¶ 270. She noted that Brandon was "eating and drinking," despite "no evidence of Pace being offered food or water on over 8 hours of video footage." ¶ 270. The medical "records do not match the

10

seriousness of what was happening." ¶ 270.

Nurse Behr failed to assist or intervene when Brandon's condition clearly deteriorated. Moreover, while Nurse Behr was present on video during one of the medical encounters with Brandon, there was no documentation of this medical encounter. ¶ 273. As to Nurse Townsend, the evidence that she was present in the unit, could hear Brandon's cries, and ignored them creates a triable issue of fact. ¶ 174. As to Nurse Conner's "abbreviated evaluation of Brandon [at 9:30 p.m.] and the fact that she left him lying face down on the cell floor show a disregard for Brandon's safety, wellbeing and serious medical condition." ¶ 289. Minutes after she left the cell, the officer called his sergeant, who called a Code 16 (for unresponsive inmate). ¶ 237-238. A jury could infer that Nurse Conner ignored obvious signs of distress and did not conduct a thorough assessment. ¶ 225-228, 233-243.

Defendants argue that disagreement between medical providers does not constitute deliberate indifference, citing *Dulany v. Carnahan*, 132 F.3d 1234, 1244 (8th Cir. 1997). While Defendants correctly state the law, they misapply it to this case. In *Dulany*, the plaintiff's expert merely "raise[d] questions about the adequacy of care," which the court found insufficient. Here, Dr. Hughes does far more than raise questions, he identifies systematic failures on the Defendants' part to follow established protocols or the standard of care, conduct adequate assessments, and/or escalate care despite obvious clinical indicators to do so. Dr. Hughes opined that Defendants' assessments were "cursory at best," and that leaving Brandon lying face down showed "a disregard for his safety, wellbeing, and demonstrated a serious medical condition," and illustrated that "not even the bare minimum in care standards were met while he suffered in a cell for hours." ¶ 296. This is precisely the type of conduct that constitutes deliberate indifference.

Defendants argue that a policy violation alone does not constitute deliberate indifference, citing *Luckert v. Dodge County*, 684 F.3d 808, 819 (8th Cir. 2012). While this is true in isolation, the lack of training on protocols and the systematic disregard of multiple protocols[4] *combined* with a failure to exercise sound medical judgment creates genuine fact issues. The Defendants failed to escalate care for an obviously impaired and distressed individual. While documentation suggests that Dr. Lovelace was contacted, there is no documentation of any response or further care ordered. ¶ 262. Brandon was left in a dry cell for hours without medical care, despite his obviously serious condition. While violation of a policy alone may not constitute deliberate indifference, the systematic disregard of multiple protocols designed to protect inmates, combined with the failure to exercise sound medical judgment, creates a genuine issue as to whether Defendants acted with deliberate indifference.

Defendants cannot dispute that they had actual knowledge of facts creating a substantial risk of serious harm. They knew: (1) Brandon had ingested methamphetamine; (2) Brandon had been sprayed with OC spray; (3) Brandon was exhibiting agitated, erratic, and distressed behavior for hours; and (4) methamphetamine intoxication combined with chemical agent exposure creates serious medical risks. Based on the totality of the circumstances, a jury could conclude that Defendants knew, or should have known, that Brandon faced a substantial risk of serious harm and that their failure to escalate his care constituted deliberate indifference. These competing characterizations of the nurses' conduct must be resolved by a jury.

---

[4] For example, MDOC's own death investigation report stated that "Medical staff are required to check an offender on a dry cell status every two hours." ¶ 217. The Centurion Defendants contend – and rely upon the fact that – they followed a four-hour assessment schedule in a separate protocol, creating a factual dispute that must be resolved by the jury. ¶ 219. Even under the four-hour protocol, the adequacy of the assessments is disputed.

**B. Genuine issues of material fact preclude summary judgment on Plaintiff's *Monell* claims (counts 6 and 7).**

"A corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies." *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 590 (8th Cir. 2004) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690). "The test is whether there exists a policy, custom or action by those who represent official policy which inflicts an injury actionable under § 1983." *Id.* Section 1983 liability may arise against a state contractor when the violation is attributable to (1) an official policy; (2) an unofficial custom; or (3) a deliberately indifferent failure to train or supervise. *Corwin v. City of Indep.*, 829 F.3d 695, 699 (8th Cir. 2016) (internal citations omitted).[5]

### 1. Centurion adopted and implemented MDOC's policies.

As to Count 6, Plaintiff alleges that Centurion adopted, implemented, or enacted policies, customs, or practices of deliberately refusing to provide medical attention to inmates who requested it, refusing to provide medical attention to those in objective need, refusing to provide life-saving medical attention, deferring to prison officials to assess inmate medical needs, ignoring an inmate's need for medical attention by allowing the inmate to suffer, linger and die, and conspiring with the MDOC to deprive inmates of objectively necessary medical care.

Defendants argue that Centurion had no official policies at Tipton Correctional Center and that all policies were promulgated by MDOC. But the evidence is clear that Centurion agreed to adopt and follow the MDOC policies as its own. ¶¶ 8, 277. According to Centurion, "its contract with the Missouri Department of Corrections states that Defendant must obtain the Missouri Department of Corrections' approval prior to initiating or changing any protocols

---

[5] Defendants argue that without an underlying constitutional violation, there can be no *Monell* liability, citing *Brabbit as Tr. for Bild v. Capra*, 59 F.4th 349, 354 (8th Cir. 2023). However, genuine disputes exist as to whether individual defendants violated Brandon's Eighth Amendment rights, necessitating denial of summary judgment on the *Monell* claims as well.

13

and/or procedures." ¶¶ 23-24. Thus, Centurion can be held liable for agreeing to implement, and implementing, the MDOC policies that led to Brandon's death.

*Monell* liability can arise from an "unofficial custom" as well as an official policy. *See Corwin*, 829 F.3d at 700.[6]  Dr. Hughes directly addresses the corporate custom issue, opining that "this and the other medical evaluations of Mr. Pace throughout the day, which each fail to meet the standard of acceptable medical care as discussed herein, suggest corporate customs and practices established by Centurion to provide abbreviated, sub-par medical care to MDOC inmates." Hughes Expert Rep. at 32. The evidence demonstrates multiple instances of abbreviated assessments: Nurse Mefford conducted assessments through the food port without entering the cell, ¶ 76; the saline applied for decontamination was grossly insufficient, ¶ 314; nursing documentation was demonstrably false, ¶ 270; and there was a delay of over three hours between medical checks despite policy requiring checks every two hours, ¶¶ 200, 203, 204, 208, 211, 215-216.

Plaintiff also alleged specific prior incidents in which inmates were denied medical care after OC spray exposure, including the death of Othel Moore.[7] ¶¶ 324-328. Defendants argue, citing *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999), that "evidence of other complaints are not sufficient to avoid summary judgment absent evidence that the other complaints are factually similar." Def. Mem. at 29. But there *is* evidence of similar patterns. The record contains documentation of numerous other lawsuits against Centurion at MDOC facilities

---

[6] To demonstrate an unofficial custom, plaintiff must show (1) a continuing, widespread pattern of unconstitutional conduct by the entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the entity's policymaking officials after notice; and (3) the alleged constitutional violation was attributable to the unofficial custom.
[7] The evidence of parallel constitutional violations in factually similar cases is relevant in a summary judgment analysis.

14

involving similar issues, including inadequate medical care, failure to respond to emergencies, and OC spray incidents. ¶¶ 323-328.

The evidence shows Centurion nurses failed to follow the pepper agent protocol and the overdose/ingestion protocol. They documented alleged assessments that never happened as reflected in the video evidence. And they failed to provide medical intervention despite over three hours of Mr. Pace exhibiting obvious signs of medical and psychological distress. These failures stemmed from Centurion's corporate practices, not merely MDOC policies. The record contains substantial evidence from which a reasonable jury could find that Centurion maintained a custom or practice of providing inadequate medical care and a pattern of abbreviated assessments. Summary judgment on Count 6 should be denied.

### 2. Centurion deliberately or recklessly failed to train its medical staff to provide necessary medical care (Count 7).

The evidence demonstrates that Centurion deliberately or recklessly failed to train staff on the need to provide medical attention for inmates in medical distress, medical observation for inmates ingesting an unknown substance, medical attention for any inmate requesting it, and/or medical attention when objectively necessary. First, while Centurion on the hand admits that it was supposed to follow MDOC's policies on medical care, its medical staff does not know all of the policies nor where to find them. ¶ 218. Moreover, Centurion's medical staff uniformly disclaimed that Centurion provided formal training on those policies, and the informal training was practically non-existent. ¶¶ 50-52.

All of the nurses testified they received inadequate or no training on critical protocols, including on the use of OC spray on methamphetamine-impaired individuals, decontamination procedures for OC spray, and caring for the inmate after they are sprayed (such as that the person should be kept sitting upright). ¶ 52. The lack of training on OC spray is shocking given that

15

every correctional officer carries a small canister of OC spray on their utility belts. ¶ 33.

Further, Centurion failed to ensure that correct training was provided. Paul Adee[8] testified that correctional staff were trained incorrectly not to decontaminate if the inmate was high. ¶¶ 53, 312. Thus, leaving training of nurses to MDOC correctional staff compounded the nurses' utter lack of preparation to render care in the correctional healthcare setting. Centurion's complete lack of training reflects a "deliberate and conscious choice" by corporate, demonstrating a deliberate indifference to the constitutional rights of inmates.

Centurion provided just as little care to its hiring practices for nurses. Dr. Hughes noted that Centurion's vetting procedures were inadequate, as nurses materially lied on their credentialing applications regarding prior employment and terminations, which should have made them ineligible for employment with Centurion. ¶ 272.

Ultimately, the lack of training on key policies contributed to Brandon's death. The record is replete with evidence that Centurion failed to train its nursing staff on critical policies and protocols that, had they been followed, would have prevented this tragedy. Nurse after nurse testified that they were never trained that OC spray was contraindicated for individuals under the influence of illicit substances—particularly methamphetamine—despite this being a well-recognized danger in the corrections industry. This training failure had immediate consequences with apparent nurse approval to deploy OC spray. The nurses were equally untrained on proper decontamination procedures; when Nurses Townsend, Mefford, and Behr arrived to treat Brandon after he was sprayed with a riot-sized canister of chemical agent, they performed only a cursory application of saline to his eyes—grossly insufficient given the massive quantity of OC

---

[8] On the one hand, Centurion argues in its *Daubert* motion that Mr. Adee should not opine on the nurses' actions, but only on correctional staff. On the other hand, Centurion claims it followed MDOC policies and outsourced training of its nurses to correctional staff. ¶¶ 50-51.

spray covering his bare torso, arms, and face—and left significant amounts of chemical agent on his person. Critically, no Centurion nurse was trained that an individual who has been OC sprayed must be kept sitting upright to prevent positional asphyxiation, a fact that correctional officers—but not nurses—were taught. As a direct result of this training gap, when Nurse Conner entered Brandon's cell for her final assessment and found him lying face down on the floor with his hands trapped beneath his chest, she failed to sit him upright, failed to roll him over for a proper assessment, and instead left him in that prone position—the very position that, combined with his methamphetamine ingestion, chemical agent exposure, full-body restraints, and hours of untreated distress, led to his death mere minutes later.

These were not isolated oversights; they were the predictable and foreseeable consequences of Centurion's systemic failure to train its nurses on the dangers of OC spray in conjunction with drug intoxication, the critical importance of proper positioning after chemical agent exposure, and the urgent need for thorough decontamination and continuous monitoring of individuals in obvious medical distress. A reasonable jury could find that Centurion's failure to properly train and supervise its staff was deliberately indifferent and was a moving force behind the constitutional violations Brandon suffered.

### C. Defendants acknowledge that Brandon is a class of one, and genuine issues of material fact exist regarding Plaintiff's Equal Protection claim (Count 5).

The Equal Protection Clause of the Fourteenth Amendment commands that no State may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. 14. A class-of-one equal protection claim "is stated when a plaintiff alleges that a defendant intentionally treated [him] differently from others who are similarly situated and that no rational basis existed for the difference in treatment." *Mathers v. Wright*, 636 F.3d 396, 399 (8th Cir. 2011). To state an equal protection claim, Plaintiff must plausibly allege the decedent was treated

17

differently than similarly situated inmates, Defendants' treatment of the decedent was intentional, and Defendants' treatment of the decedent lacked any rational basis. *Id.*

A jury could find that the evidence reflects a class of one equal protection on the basis that Brandon was singled out and intentionally denied medical treatment, as compared to other inmates who were medically monitored after ingesting an illicit substance, who were not tortured with pepper spray, who were decontaminated after being pepper sprayed, and who were provided medical assistance when requested.[9] Defendants' argument that Plaintiff lacks evidence is undermined by their own admission that Brandon "was, in some respects, treated differently than the offender in the adjacent dry cell." Because the inmate in the adjacent dry cell was not sprayed with OC, Defendants attempt to rationalize this differential treatment by asserting that the other inmate was "significantly more compliant," but that is a subjective decision for the jury. In fact, Brandon complied with the directive to strip down, ¶¶ 61, 119 but was otherwise cognitively impaired by an overdose of drugs. ¶¶ 120-130, 146. Whether Brandon's conduct justified the differential application of OC spray while he was in a dry cell, as compared to the adjacent inmate who was not sprayed, is a disputed question of fact. Defendants' subjective characterization of relative "compliance" does not entitle them to summary judgment. A reasonable jury could conclude that the differences in treatment were not rationally related to any legitimate penological interest.

Defendants' reliance on inmate Carjuan Adkins as a comparator actually undermines their position. Defendants state that Adkins "was treated the same way" as Brandon, i.e. sprayed with OC spray and placed in a dry cell. However, the relevant inquiry is not merely whether the same

---

[9] Plaintiff may properly plead alternative theories of recovery. *Babcock & Wilcox Co. v. Parsons Corp.*, 430 F.2d 531, 536 (8th Cir. 1970) (citing Fed. R. Civ. P. 8(e)(2)).

initial actions were taken, but whether the subsequent medical monitoring, assessment, and response were comparable. Defendants have not established that Adkins was similarly situated in all material respects, including the duration of confinement, the medical attention provided, the frequency of welfare checks, and the ultimate outcome. The mere fact that two offenders were both sprayed with OC spray and placed in dry cells does not establish that they received equivalent treatment in all respects relevant to Plaintiff's claims.

Defendants argue that because they utilized the charting guide available to them and followed the standard protocol, their conduct was not unique to Brandon. This argument misses the mark. The existence of a protocol does not immunize Defendants from liability where they were not trained on the protocol, failed to apply that protocol consistently, and exercised discretion within the protocol in a manner that disfavored Brandon without rational basis. A reasonable jury could find that Defendants deviated from standard practice in their treatment of Brandon or applied the protocol in a discriminatory manner.

The record contains sufficient evidence from which a reasonable jury could conclude that Brandon was treated differently than similarly situated offenders without rational justification. Defendants' argument acknowledges differential treatment between Brandon and the inmate in the adjacent dry cell. Questions regarding the reasons for that differential treatment, whether those reasons were pretextual, and whether Defendants' conduct lacked a rational basis are inherently fact-intensive inquiries inappropriate for resolution on summary judgment.

### D. Questions of fact exist as to whether Brandon Pace is a third-party beneficiary to the Centurion-MDOC contract for the provision of medical care to inmates.

"A third party beneficiary is one who is not privy to a contract or its consideration, but who may nonetheless maintain a cause of action for breach of the contract." *L.A.C. v. Ward Parkway Shopping Ctr. Co., L.P.*, 75 S.W.3d 247, 260 (Mo. 2002) (citation omitted). "To be

19

bound as a third-party beneficiary, the terms of the contract must clearly express intent to benefit that party or an identifiable class of which the party is a member." *Hoops v. Medical Reimbursements of Am., Inc.*, 2018 U.S. Dist. LEXIS 34257, *23-24 (E.D. Mo. Mar. 2, 2018), vacated on other grounds, 2018 U.S. Dist. LEXIS 217240 (E.D. Mo. Dec. 28, 2018) (quoting *Torres v. Simpatico, Inc.*, 781 F.3d 963, 971 (8th Cir. 2015)).

Here, Centurion has admitted that the purpose of its agreement with MDOC is "to provide medical, dental, and behavioral health care for inmates in the custody of MODOC." ¶¶ 1-2. As an inmate, it is clear that Brandon was an intended beneficiary of the medical care Centurion promised MDOC it would provide. However, Centurion seeks summary judgment based on an unsigned copy of a contract with MDOC which purports to contain language calling inmates who receive benefits "incidental beneficiaries." *See* Def. SOF ¶ 76. However, on November 14, 2025, this Court denied Centurion's motion to dismiss based on this same argument, because Centurion did not provide an executed contract containing the limiting language. *See* ECF 171 at 6. Here, Centurion repeats the same argument with the same flaw, i.e. never producing a complete and executed version of the contract.

In construing contracts, Missouri courts do not look at contractual provisions in isolation. *See Tuttle v. Muenks*, 21 S.W.3d 6, 9 (Mo. App. W.D. 2000). Rather, "[a] contract must be construed as a whole. It must be viewed from end to end and corner to corner." *Bringer v. Bringer*, 2025 Mo. App. LEXIS 866, at *23-24 (Mo. App. E.D. Dec. 16, 2025) (quoting *Fuller v. TLC Prop. Mgmt., LLC*, 402 S.W.3d 101, 104 (Mo. App. S.D. 2013)). Centurion's failure to produce a complete and executed copy of the contract precludes the Plaintiff's, and this Court's, ability to construe the contract as a whole. Thus, like the motion to dismiss, Centurion's motion for summary judgment should be denied.

20

**E. Centurion of Missouri, LLC and MHM Services, Inc. are not shielded from liability for Plaintiff's state law claims (Counts 10 and 11).**

Centurion of Missouri, LLC and MHM Services, Inc. are not shielded from vicarious liability here. R.S.Mo. § 538.210 provides that "[n]o health care provider whose liability is limited by the provisions of this chapter shall be liable to any plaintiff based on the actions or omissions of any other entity or individual who is not an employee of such health care provider," but this protection is subject to a critical exception. The statute expressly provides that a health care provider may still be held vicariously liable for the conduct of an individual who is "an employee of a subsidiary in which the health care provider has a controlling interest" unless the subsidiary carries adequate professional liability insurance. *Id.*

The Centurion corporate structure reveals that Centurion of Missouri, LLC is a subsidiary of Centurion, LLC, which is a subsidiary of MHM Services, Inc., which is a subsidiary of Centurion Equity, Inc. ¶ 3. MHM Health Professionals, LLC, which Defendants claim is the actual employer of the individual defendant nurses, is also a subsidiary of MHM Services, Inc. ¶ 4. Despite different corporate names, Centurion's corporate representative Keith Lueking testified that he serves as Chief Administrative Officer for Centurion of Missouri, LLC and that the same individuals hold the same positions across all of the Centurion-related entities. ¶ 5. Because MHM Services, Inc. has a controlling interest in MHM Health Professionals, LLC, the subsidiary exception in § 538.210 applies, and MHM Services, Inc. may be held vicariously liable for the conduct of MHM Health Professionals, LLC's employees.

The statute was designed to protect healthcare providers from liability for the acts of truly independent third parties—not to permit corporate parents to escape liability for the conduct of employees of their own wholly-owned subsidiaries who perform services under the parent's contract. Centurion of Missouri, LLC holds the contract with the Missouri Department of

21

Corrections for medical care for inmates. ¶¶ 1-2. The nurses performed those services on behalf of Centurion of Missouri, LLC, even if they were technically employed by a sister subsidiary, MHM Health Professionals, LLC. In fact, the nurses' employment offer letters expressly identified the Missouri Department of Corrections as the "Client" and required the nurses to "comply with all internal policies and procedures as well as any Client's policies and procedures." ¶¶ 7-8. The nurses were required to work within the Centurion system, use Centurion's timekeeping systems, report to Centurion supervisors, and receive Centurion-provided professional liability insurance. ¶¶ 9-10.

Section 538.210 should not be interpreted to allow such corporate structuring to defeat vicarious liability where the healthcare services are provided under the contracting entity's authority and control. The common management and operating structure demonstrates that the formal separation between MHM Health Professionals, LLC and Centurion of Missouri, LLC is largely a legal fiction designed to avoid liability rather than a reflection of how the entities actually operate.

Finally, the Centurion Defendants have failed to meet their burden of establishing compliance with the insurance requirements. The Centurion Defendants assert only that "[a]ll of the individual defendants . . . are covered by insurance policies with in excess of $1 million of coverage." Def. SOF ¶ 74. This conclusory assertion is insufficient to establish the specific statutory requirements, which requires coverage for *each* individual defendant of at least one million dollars per occurrence separately from coverage for the subsidiary—not merely aggregate corporate coverage from which individuals might benefit.

Missouri law has long recognized that an employer may be held vicariously liable for the negligent acts of its employees committed within the scope of their employment under the

doctrine of *respondeat superior*. Section 538.210 does not purport to abrogate this common law

doctrine entirely; rather, it creates a narrow exception for certain health care providers under

specified circumstances.

If the Court is inclined to enter judgment on this basis, Plaintiff seeks leave to amend, as

Defendant never previously raised this issue and Plaintiffs only discovered the complicated

corporate structure near the close of discovery. Amendment at this stage would not affect the

trial date or prejudice any party—discovery against the newly named defendant is already

complete, and the law permits amendment prior to trial as justice requires.

**F.  The evidence demonstrates that the Centurion Defendants' actions were a substantial cause of Brandon's death, precluding summary judgment on Counts 4, 8, 10 and 11.**

Dr. Hughes has opined that the care provided to Brandon was substandard and breached

the standards of care. ¶ 291.  Defendants' expert, Dr. Fowlkes, offers a competing opinion. This

competing expert testimony is precisely the type of dispute that must be resolved by a jury.

*Dulany v. Carnahan*, 132 F.3d 1234, 1244 (8th Cir. 1997). Moreover, the competing statements

of fact are overrun with questions of fact that belong before a jury.

Expert testimony also creates a genuine issue of fact as to causation. Defendants argue

that methamphetamine was the sole cause of death and that their conduct did not cause

Brandon's injuries. Dr. Hughes directly rebuts this contention, opining that Brandon's "condition

was initially treatable, if promptly addressed, and recovery would in all likelihood have been the

ultimate outcome."  ¶ 292. In his rebuttal report, Dr. Hughes specifically responds to Defendants'

causation arguments, stating that "the failures materially increased risk and took away the

opportunity for lifesaving intervention before arrest" and that "an ED can provide continuous

monitoring and treatment that a dry cell cannot—sedation when medically necessary, IV fluids,

cooling, airway/oxygen support, and rapid response to dangerous heart rhythms." ¶ 296. Dr.

23

Hughes' causation testimony is sufficient to create a genuine dispute of material fact. The question of whether timely medical intervention could have saved Brandon's life must be resolved by a jury. See *Dulany*, 132 F.3d at 1244.[10]

### G. The record supports Plaintiff's demand for punitive damages.

Defendants argue, citing *Coleman v. Rahija*, 114 F.3d 778, 787 (8th Cir. 1997), that they are entitled to summary judgment on Plaintiff's request for punitive damages because there is no evidence that Centurion "acted with evil intent" or "callous indifference to the federally protected rights" of Brandon, and that Centurion "did not intend to harm" or demonstrate "malicious conduct" that harmed Brandon under Missouri law. *See Smith v. Wade*, 461 U.S. 30, 56 (1983) (Punitive damages are recoverable when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.").

In *Coleman*, the Eighth Circuit overturned a punitive damages verdict where the defendant nurse attempted to follow guidelines when providing care, reasoning that their conduct was not sufficiently egregious to justify the imposition of punitive damages. Here, by contrast, the evidence shows that Defendants *did not* follow guidelines, but provided cursory assessments, failed to escalate care despite obvious distress, and left Brandon to suffer for hours without adequate intervention before he died. The evidence demonstrates that Defendants systematically disregarded Brandon's serious medical needs despite obvious signs of distress, failed to follow established protocols designed to protect inmates, and left him to suffer for hours without adequate medical intervention – all of which is captured on video for the jury to draw its own

---

[10] To the extent necessary, Plaintiff incorporates her oppositions to the Defendants' *Daubert* motions to exclude the testimony of experts Dr. Hughes and Mr. Adee (ECF 261, 260) to respond to Defendants' arguments in Section VII of their motion.

conclusions. A reasonable jury could find Defendants' conduct demonstrates reckless or callous indifference to Brandon's constitutional rights, warranting punitive damages under federal and state law.

## IV. CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court deny the Centurion Defendants' Motion for Summary Judgment in its entirety and for any other relief this court deems just.

Dated: April 3, 2026

Respectfully submitted,

By: */s/ Elizabeth A. Fegan*
Elizabeth A. Fegan, Esq. (*pro hac vice*)
Timothy A. Scott, Esq. (*pro hac vice*)
Shannon S.F. Lohrentz, Esq. (*pro hac vice*)
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Phone: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com
tim@feganscott.com
shannon@feganscott.com

Tom Porto, Esq.
Bar No. 59716
Popham Law Firm
712 Broadway Blvd., #100
Kansas City, MO 64105
Ph: (816) 221-2288
Fax: (816) 221-3999
tporto@pophamlaw.com

*Counsel for Plaintiff Tammy Reed*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings upon the following.

Dennis S. Harms
Alec D. Jarvis
SANDBERG PHOENIX & von GONTARD P.C.
dharms@sandbergphoenix.com
ajarvis@sandbergphoenix.com
Attorneys for the Centurion Defendants

Kelli Reichert
Olivia Finley
Assistant Attorney General
Kelli.reichert@ago.mo.gov
Olivia.finley@ago.mo.gov
Attorneys for MODOC Defendants

*/s/ Elizabeth A. Fegan*
Elizabeth A. Fegan

1