**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | | |
|---|---|---|
| TAMMY REED, Individually and as next-of-kin of Brandon Pace, deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 2:24-CV-04152-BCW |
| MISSOURI DEPARTMENT OF CORRECTIONS, et al., | ) ) ) | |
| Defendants. | ) ) | |

**ORDER**

Before the Court is the Centurion Defendants' Motion for Summary Judgment. (Doc. #252). The Court, being duly advised of the premises, grants in part and denies in part said motion.

**BACKGROUND**

On April 7, 2023, Brandon Pace ("Decedent") was a prisoner in the custody of the Missouri Department of Corrections ("MDOC") and serving his sentence at the Tipton Correctional Center ("Tipton" or "TCC"). (Doc. #117 at 7, 13-14). On that day, he was under the influence of methamphetamine and transferred to the administrative segregation unit. (Doc. #117 at 13; Doc. #273-7 at 1; Doc. #273-27). There, Decedent ingested more methamphetamine, was pepper sprayed, left in a locked cell with limited medical attention, became unresponsive, and stopped breathing. (Doc. #253-16 at 3; Doc. #253-17 at 8; Doc. #266-36, Video 1946 at 5:14:00). EMS pronounced Decedent dead at 10:20 p.m. (Doc. #273-5 at 2).

On September 5, 2024, Decedent's mother, Plaintiff Tammy Reed, filed the above-captioned case in this Court as Decedent's next-of-kin and on her own behalf, alleging constitutional and state law claims. (Doc. #1).

1

On June 27, 2025, with leave of Court, Plaintiff filed a Second Amended Complaint (Doc. #117), alleging twelve claims against more than thirty defendants, including MDOC, prison officials, correctional officers, MDOC's medical contractor, and individual healthcare workers. On November 14, 2025, the Court dismissed Counts 6 and 7 against the individual healthcare workers. (Doc. # 171). All other claims, except those voluntarily dismissed by Plaintiff, remain pending.

In the instant summary judgment motion, Centurion of Missouri, LLC; MHM Services, Inc.; Anna Mefford, LPN; Robin Behr, MSN; Kristy Gaines, RN (incorrectly named as Kristy Gains); Cara Connor, LPN (incorrectly named as Cara Connors); and Nicole Townsend, PHN (collectively, "Centurion Defendants") seek summary judgment in their favor on the eight counts against them. (Doc. #252). Plaintiff filed an opposition (Doc. #272), and the Centurion Defendants filed a reply (Doc. #288). For the following reasons, the Court concludes summary judgment is appropriate on the breach of contract claim (Count 1) against Centurion of Missouri and MHM Services (collectively, "Centurion"); the § 1983 deliberate indifference claim (Count 4) against Behr and Gaines; the § 1983 equal protection claim (Count 5) against all Centurion Defendants; the 1983 deprivation of companionship and society claim (Count 8) against Behr and Gaines; the claim arising under Mo. Rev. Stat. § 537.020 (Count 10) against Centurion, Behr, and Gaines; and the wrongful death claim (Count 11) against Centurion, Behr, and Gaines.

## UNCONTROVERTED FACTS[1]

The relevant facts supported by the summary judgment record and viewed in a light most favorable to Plaintiff are as follows.

---

[1] The parties cite video evidence to support many of their proposed facts. Much of the video evidence does not contain audio. Due to the angle of the cameras and obstacles obscuring the view, it is generally difficult to ascertain the events recorded. Further, the videos do not identify the persons depicted. Pursuant to the standard of review, the video evidence is viewed in Plaintiff's favor.

## A.    The Defendants

In November 2021, MDOC and Defendant Centurion of Missouri entered into a contract, wherein Centurion of Missouri provides healthcare services to incarcerated persons at Tipton. (Doc. #253-23 at 3; Doc. #266-2 at 9-10). Centurion of Missouri is a subsidiary of non-party Centurion, LLC, which is a subsidiary of Defendant MHM Services, Inc. (Doc. #253-20 at 3).

At all relevant times, non-party MHM Health Professionals, LLC employed Defendants Townsend, Mefford, Connor, Behr, and Gaines (collectively, the "nurses" or "medical personnel"). (Doc. #253-20 at 2, 4; Doc. #253-17 at 2). MHM Health Professionals maintained insurance policies covering each nurse's work with policy limits exceeding $1 million. (Doc. #253-22 at 6-7). MHM Health Professionals is also a subsidiary of Defendant MHM Services. (Doc. #253-20 at 2).

Although the nurses were employed by MHM Health Professionals, their job duties were determined by Centurion of Missouri's contract with MDOC. (Doc. #253-20 at 2, 4; Doc. #253-17 at 2).[2] The contract between MDOC and Centurion of Missouri contains the following language:

> The contract is not intended to create any rights, liberty interest, or entitlements in favor of any individual. The contract is intended only to set forth the rights and responsibilities of the parties hereto. Therefore, it is expressly understood and agreed that enforcement of the terms and conditions of the contract, and all rights or action relating to such enforcement, shall be strictly reserved to the parties hereto, and nothing contained in the contract shall give or allow any claim or right of action whatsoever by any other person on the agreement. It is the express intention of the parties hereto that any entity, other than the parties hereto, receiving services or benefits under the contract shall be deemed an incidental beneficiary only.

(Doc. #253-23 at 1-2).

---

[2] Beyond a common parent company, the record does not explain the relationship between MHM Health Professionals and Centurion of Missouri, specifically the conditions under which Centurion of Missouri uses MHM Health Professionals' employees to fulfill Centurion of Missouri's contractual duties to MDOC.

Plaintiff has also named MDOC and 19 of its employees as defendants in this matter. Those defendants are collectively referred to as the MDOC Defendants. The claims against the MDOC Defendants are not addressed herein. Any reference to the conduct of the MDOC Defendants is provided for context only.

## B. Training on Relevant Policies and Procedures

Pursuant to the contract between MDOC and Centurion of Missouri, Centurion personnel are obligated to follow the medical policies and procedures developed and maintained by MDOC. (Doc. #253-20 at 5; Doc. #266-2 at 15). MDOC has certain policies and procedures –called "protocols" – uploaded into its electronic medical record system, including protocols entitled initial segregation evaluation, dry cell protocol, pepper agent protocol, and overdose/ingestion/Narcan protocol. (Doc. #266-22 at 3-4; Doc. #253-23 at 2-3). MDOC has also compiled the medical protocols in a book for reference. (Doc. #266-32 at 9). These protocols were in effect before MDOC and Centurion of Missouri entered into the contract.

MDOC required the medical personnel to obtain its "approval prior to initiating or changing any protocols and/or procedures." (Doc. #266-3 at 17). Despite this requirement, the Centurion Defendants opine that the medical personnel are not "precluded from using their clinical judgment in strict compliance with the language of any policy, procedure or guideline." (Doc. #266-3 at 17).

The medical protocols at issue provide checklists to guide the medical personnel's examination of a prisoner when faced with a specific situation. (Doc. #266-20 at 6-7; Doc. #266-32 at 6-7, 9-11; Doc. #266-22 at 3-4; Doc. #266-2 at 15). Each medical protocol contains three sections: subjective, objective, and assessment/plan. (Doc. #253-2; Doc. #253-14). The subjective section allows for a narrative. (Doc. #253-2; Doc. #253-14). The objective section is a checklist of

4

medical barometers requiring a yes/no response. (Doc. #253-2; Doc. #253-14). The assessment/plan section contains space for a narrative and also includes a checklist requiring a yes/no response and space for related notes. (Doc. #253-2; Doc. #253-14).

Centurion relied on MDOC to provide training to the medical personnel regarding nursing obligations in correctional-specific situations such as dry cell placement, use of force, and mechanical restraints. (Doc. #266-2 at 16, 22-23; Doc. #266-20 at 8).

Centurion also used on-the-job training or shadowing to train medical personnel by pairing a nurse new to Tipton with a different veteran nurse each day. (Doc. #266-20 at 8, 15-16; Doc. #266-32 at 4-5). For example, Behr had over 20 years of nursing experience but was new to the correctional environment on April 7, 2023, the date of Decedent's death. (Doc. #266-20 at 9-10). She was receiving on-the-job training commensurate with her lack of corrections and facility-specific experience at the time. (Doc. #266-20 at 9-10). Her training on specific protocols (dry cell, pepper agent, etc.) happened as the circumstances arose. (Doc. #266-20 at 8). So, Behr's training on the pepper agent protocol began with her observation of Townsend and Mefford decontaminating Decedent after he had been pepper-sprayed. (Doc. #266-20 at 11-14).

In addition to the medical protocols, MDOC also maintains separate policies and procedures applicable to correctional officers. (See Doc. #273-5; Doc. #266-24). These policies and procedures include references to medical personnel's role in the procedures. (See Doc. #273-5 at 3; Doc. #266-24 at 6).

It is unclear what, if any, training medical personnel received on the policies and procedures not included in the protocols. For example, Townsend did not recall the "Dry Cell Procedures" document – separate from the dry cell protocol – which requires that the restraints of prisoners in dry cell status be checked every two hours. (Doc. #266-33 at 19). Instead, Townsend

followed the dry cell protocol, which provides that restraints can be examined every four hours or every two hours depending on certain factors. Id.

To the extent relevant, these policies and procedures are further described below.

**C.      Timeline of Events on April 7, 2023**

*1.      Transfer to Segregation*

On April 7, 2023, Decedent was involved in an altercation with another prisoner and then transferred to the administrative segregation unit ("Segregation"). (Doc. #117 at 13). Decedent was already intoxicated when transferred. (Doc. #273-7 at 1). Once in Segregation, Decedent was placed in a "dry cell" holding cell, which is an empty jail cell without any furniture, toilets, or water. (Doc. #266-12 at 8; Doc. #266-14 at 4; Doc. #273-5). A dry cell is used when a prisoner is under the influence of an illicit substance, when there is a concern that the prisoner may hurt himself or someone else, and/or to observe the prisoner closely and monitor the prisoner's feces for any baggies of drugs. (Doc. #266-18 at 9-10; Doc. #266-20 at 19).

MDOC's "Dry Cell Procedures" provide:

4.      **Before placement of dry cell begins**, medical will be notified and should be on stand-by while the placement process takes place. Once the offender is fully on dry cell status, Medical will check to ensure that there is adequate blood flow to all of the offender's extremities. Medical staff members may place gauze and tape on the offenders wrists and ankles in order to prevent chaffing; however, there will be no more than two (2) wraps of gauze allowed on the offenders [sic] wrists and ankles at any one time. Medical staff will examine the restraints **every two (2) hours** or **anytime the restraints are adjusted** by a COIII or higher. Footwear (non-skid) is also provided by Medical.

 (Doc. #273-5 at 3) (emphasis added). There is no evidence that medical personnel were contacted before Decedent being placed on dry cell status.

At approximately 2:56 p.m., Defendant Anna Mefford performed an initial evaluation of Decedent after evaluating a prisoner in the dry cell adjacent to Decedent. (Doc. #253-1 at 3-5, 7-

6

8; Doc. #253-2; Doc. #253-3). The "initial segregation evaluation" protocol instructs medical personnel to take the prisoner's vitals (i.e., blood pressure, blood oxygen levels, temperature, etc.) and record any "lay-ins" (i.e., special dietary needs, allergies, assistive device such as a cane, etc.). (Doc. #253-1 at 3; Doc. #253-2).

At the time of her deposition, Mefford could not recall many of the specifics of her initial encounter with Decedent and contradicted herself on some details, such as whether she took Decedent's temperature. (Doc. #253-1 at 4-5, 7-8; Doc. #266-32 at 22). Despite that, Mefford recalled that Decedent stated he did not have any lay-ins or suicidal ideation. (Doc. #253-1 at 5). Video evidence confirms Mefford was unable to take all of Decedent's vitals. (Doc. #253-1 at 5; Doc. #253-2; Doc. #253-3). According to Centurion's Chief Medical Officer, Dr. Jerry Lee Lovelace, Jr., it is relatively important for nurses assessing inmates on dry cell status to check the inmate's vital signs to ensure that nothing such as an unwitting intoxication is occurring. (Doc. #266-31 at 8-9).

Mefford charted the encounter on the "initial segregation evaluation" protocol in the electronic medical record. (Doc. #253-2). In the "subjective" section, Mefford noted that she was unable to obtain vitals. Id. In the "objective" section, she marked "n/a" on pulse and four entries concerning blood pressure and "y" on oriented x 3, hostile/angry, denies complaint. Id. In the "assessment/plan section," Mefford wrote "initial segregation evaluation" and noted Decedent was placed in a dry cell. Id. She also indicated he did not need to be placed on a suicidal watch and there were no contraindications to segregation placement.

### 2. *Ingestion of Suspected Methamphetamine*

At approximately 3:19 p.m., MDOC employee Leonard Montes reported to Segregation after receiving a request for "CIT" (crisis intervention team) for Decedent. (Doc. #266-36, Video

1946 at 3:19:00; Doc. #273-7 at 1). Decedent told Montes that Decedent was in possession of methamphetamine. (Doc. #253-4 at 2-3). Decedent had a small baggie containing a white powdery substance. (Doc. #253-4 at 3; Doc. #253-5 at 2). Montes attempted to talk Decedent into turning over the contraband, but Decedent refused. (Doc. #253-4 at 3-4). At approximately 3:52 p.m., Montes witnessed Decedent opening the baggie and swallowing its contents. (Doc. #253-4 at 5; Doc. #266-25 at 11; Doc. # 273-7 at 3). Montes described the amount of white powder ingested as a "fingernail's amount." (Doc. #253-4 at 5).

Montes contacted Defendant Nicole Townsend and informed her Decedent had ingested a fingernail's amount of white powder. (Doc. #253-4 at 5; Doc. #253-6 at 12-13). MDOC has an "overdose/ingestion/Narcan" protocol for medical personnel to follow when a prisoner ingests a suspected illicit substance. (Doc. #266-30). The protocol requires that a "licensed healthcare provider" be consulted in all cases and that "[m]edical staff members will examine the restraints every two (2) hours or anytime the restraints are adjusted by a COIII or higher." (Doc. #273-5 at 3; Doc. #265-1 at 9 ¶41; Doc. #288-1 at 13 ¶41).

Additionally, the Investigative Report regarding Decedent's death states:

> **Note:** The DOC's standard operating procedures (SOP) for an offender ingesting dangerous contraband are the same procedures adopted by Centurion **(TAB C)**. Medical staff are required to check an offender on a dry cell status every two hours. The two hour checks made on [Decedent] were documented by medical staff **(TAB D)**.

(Doc. #273-8 at 6).

No medical personnel responded to Segregation for nearly one-and-a-half hours after Decedent ingested the "fingernail's amount" of suspected methamphetamine. (Doc. #266-36, Video 1946 at 3:25:00-5:40:00; Doc. #266-47 at 2; Doc. #266-42 at 6-7). The nurses did not chart

8

on the overdose/ingestion/Narcan protocol during or after any of their encounters with Decedent. (Doc. #273-12).

### 3. Use of Force: Pepper Spray

After Decedent ingested the suspected methamphetamine, MDOC employee Randy Witt reported to Segregation and directed Decedent to change into an orange jumpsuit so that Decedent could be strip searched. (Doc. #253-7 at 2). Decedent did not comply with the verbal directive. (Doc. #253-7 at 2).

Tipton Warden, Brock Van Loo, was notified at approximately 3:45 p.m. that use of force on Decedent may be necessary. (Doc. #253-8). MDOC's "Use of Force Guidelines and Reports" require that, if time permits, medical personnel be contacted to determine if the prisoner has any medical conditions that would not allow the use of pepper spray during use of force. (Doc. #266-24 at 6). A MDOC employee contacted Defendant Kristy Gaines at 3:50 p.m. (Doc. #253-8). After that, approval was granted to use pepper spray if necessary. (Doc. #253-8). It is unclear if Gaines and/or Van Loo approved the use of pepper spray.

The decision on whether to use pepper spray is a security call. (Doc. #253-6 at 23). MDOC employees are taught that people under the influence of illicit drugs are more affected by pepper spray than those who are not. (Doc. #266-18 at 7-8; Doc. #266-13 at 10). The nurses had not received similar training. (Doc. #266-20 at 11-14; Doc. #266-33 at 7-8; Doc. #266-32 at 9-13; Doc. #266-34 at 9-11; Doc. #266-68 at 8).

At approximately 5:14 p.m., Witt sprayed Decedent with pepper spray twice. (Doc. #266-36, Video 1946 at 5:14:00). Decedent remained in the dry cell for approximately seven minutes while he attempted to put on an orange jumpsuit before Witt moved Decedent to the adjacent dry cell. (Doc. #266-36, Video 1946 at 5:21:00). Witt relocated Decedent from the dry cell section to

Segregation's intake area at 5:40 p.m. (Doc. #266-36, Video 1946 at 5:40:00; Doc. #266-36, Video Handheld 2). There, Decedent was seated on and chained to a security bench. (Doc. #265-1 at 24 ¶158; Doc. #288-1 at 51 ¶158; Doc. #266-36, Video Handheld 2).

Witt was involved in a separate, unrelated incident involving the use of pepper spray. (Doc. #253-7 at 4-5). Prisoner Carjuan Adkins was sprayed and placed in a dry cell at Tipton after Witt witnessed the prisoner with suspected contraband. Id.

### 4. *Medical Care Post-Pepper Spray*

At some point after pepper spraying Decedent, correctional officers contacted medical personnel. (Doc. #253-7 at 6-8). Townsend responded at approximately 5:40 p.m., checked his restraints, and then left the segregation area to obtain medical supplies to decontaminate him. (Doc. #253-9 at 4; Doc. #266-33 at 17-18). She did not check his vitals. (Doc. #266-18 at 14).

Townsend returned to Segregation with Mefford and Defendant Robyn Behr at approximately 5:48 p.m. (Doc. #253-9 at 4). At that time, Behr was shadowing the other two nurses and did not provide any direct care to Decedent. (Doc. #253-6 at 21; #253-13 at 2, 4-5). Townsend and Mefford did not immediately begin treating Decedent because the correctional officer recording the encounter had to change the battery on the camera. (Doc. #265-1 at 24 ¶165; Doc. #288-1 at 52 ¶165; Doc. #266-32 at 36; Doc. #266-33 at 16).

At 5:49 p.m., Townsend and Mefford wiped Decedent's face with gauze and flushed his eyes with liquid for approximately one minute. (Doc. #253-9 at 4; Doc. #266-36, Video Handheld 2). Decedent then asked if he could take a shower but was denied. (Doc. #266-35 at 5). Plaintiff's expert, Paul Adee, opines that this treatment was insufficient. (Doc. #266-35 at 7).

Correctional officers then escorted Decedent back to the second dry cell and seated him against the wall. (Doc. #253-12; Doc. #253-6 at 15-18). Townsend and Mefford examined his restraints, but neither took his vitals. (Doc. #253-6 at 15-18).

While in the dry cell, both Townsend and Mefford coughed and covered their faces, likely because of the effects of the pepper spray. (Doc. #265-1 at 25 ¶¶172-73; Doc. #288-1 at 53 ¶¶172-73; Doc. #266-33 at 14). Decedent was not violent or combative while Townsend and Mefford were in the dry cell with him. (Doc. #253-6 at 18). The nurses left Segregation at approximately 6:00 p.m. (Doc. #253-6 at 18).

MDOC's "Use of Force Guidelines and Reports" state "[w]hen any type of force is utilized, the offender should be examined by a nursing staff member as soon as possible to determine whether there are any injuries or other medical issues the offender is experiencing related to the use of force." (Doc. #266-24 at 8). The decontamination process began 35 minutes after Decedent was pepper sprayed. (Doc. #265-1 at 25 ¶167; Doc. #288-1 at 52 ¶167).

The guidelines also provide that "[w]hen a chemical agent or pepper spray is utilized, the offender shall be given access to water to flush his face, eyes, and other exposed skin areas as soon as possible." (Doc. #266-24 at 8). Decedent was never given water to decontaminate himself after being pepper sprayed. (Doc. #266-36, Video 1945 at 5:21:00 to end; Doc. #266-36, Video 1946 at 5:14:00 to end).

Mefford charted the encounter on the "dry cell" protocol. (Doc. #253-14). Mefford noted that correctional officers assumed Decedent had consumed "meth." (Doc. #253-14). On the objective checklist, Mefford responded "Y" to the following entries: alert and oriented x4; pupils were equal, round and reactive bilaterally; mucosa pink and moist; skin warm and dry; skin intact; skin turgor prompt; peripheral pulses present; belligerent; capillary refill < 3 seconds; distal pulses

11

palpable; and restraints do not hinder circulation. (Doc. #253-14). Mefford responded "N" to cooperative. (Doc. #253-14). On the plan checklist, Mefford responded "Y" to: assess vitals, cuff placement and pulses Q 4hrs; if patient is violent or combative, checks should be completed every 2 hours; ensure patient is eating and drinking when doing checks; and no OTC meds to be given without a provider order. (Doc. #253-14). She also noted that Dr. Lovelace was notified of Decedent's dry cell placement at 4:40 p.m. and that behavioral health was notified at 4:17 p.m. (Doc. #253-14).

There is no evidence Townsend charted the encounter. Neither nurse charted on the "pepper agent" protocol.

### 5. Connor's Evaluation

Before the end of their shift, Townsend and/or Mefford informed Defendant Cara Connor that Decedent was potentially under the influence of an unknown substance, that he had been pepper sprayed, and that she was to reassess him at 9:30 p.m. (Doc. #253-1 at 2; Doc. #253-17 at 3-5, 7). Connor understood Decedent had ingested a bag of suspected methamphetamine. (Doc. #266-34 at 13-14).

From 6:00 p.m. through 9:30 p.m., no correctional officer contacted medical about Decedent's condition. (Doc. #253-16 at 4; Doc. # 253-17 at 13). And no medical personnel assessed Decedent during this time period. (Doc. #265-1 at 29 ¶203, ¶208; Doc. #288-1 at 61 ¶203, at 62 ¶208). Throughout these three-and-a-half hours, the door to Decedent's dry cell remained closed. (Doc. #273-19; Doc. #266-132 at 17-26). He was not given any food or water. (Doc. #266-36, Video 1945 at 5:51:00 – 9:30:00).

At approximately 9:30 p.m., Connor arrived in Segregation to reassess Decedent. (Doc. #253-6 at 26; Doc. # 253-17 at 13). Just before Connor arrived, Decedent rolled from lying on his

12

back to lying face down in a prone position, with his cuffed hands beneath him. (Doc. #266-36, Video 1945 at 9:31:00-9:34:00).

MDOC employee John Samuel accompanied Connor. (Doc. #273-20 at 13). Samuel observed that the belly chain on Decedent was high and above his chest. (Doc. #273-20 at 13). Plaintiff's expert, Dr. Timothy Hughes, opines that the location of the belly chain around Decedent's chest created the risk of positional asphyxiation. (Doc. #266-27 at 15-16).

Connor entered the cell at approximately 9:31 p.m. (Doc. #266-36, Video 1945 at 9:31:00-9:34:00). Connor testified she checked the restraints on all four extremities and that she asked him to roll over so that he was not lying on his hands. (Doc. # 253-17 at 6-7, 15). She did not take Decedent's vitals, and Decedent did not respond to her questions. (Doc. #266-34 at 12; Doc. #266-31 at 17-18; Doc. #253-19). Connor testified that Decedent was breathing during her assessment. (Doc. #253-17 at 6-7, 12, 15). Connor exited the cell at approximately 9:33 p.m. (Doc. #266-36, Video 1945 at 9:31:00-9:34:00). Decedent lifted his feet as MDOC employee Lane Barker closed the cell door. Id.

Connor used the "dry cell" protocol to chart her encounter with Decedent. (Doc. #253-19). She noted it was assumed Decedent had consumed methamphetamine. Id. She indicated Decedent's vitals were within normal ranges and cuff placement was appropriate. Id. Connor marked "n" on the following: alert and oriented x 4; pupils equal, round and reactive bilaterally; mucosa pink and moist; belligerent; trauma noted; and abdominal pain. Id. She marked "y" on the following: skin intact; skin turgor prompt; peripheral pulses present; and cooperative. Id. In a narrative, Connor wrote

> This nurse asked custody to open door to dry cell. Explained to offender that I was the nurse and was going to assess him for injury. He did not respond to me but did not move while I was checking for injury or tightness around ankles, wrists, and

head. After I stepped out of cell, the officer asked him to lift his feet so the door could be closed and offender complied.

Id. Under "plan," Connor indicated she had notified the provider of dry cell placement; that Decedent's vitals, cuff placement, and pulse should be checked every four hours; that checks should be completed every two hours if Decedent become violent or combative; and that Decedent did not respond when asked to drink or eat. Id. The entry is time-stamped 9:45 p.m. Id.

### 6. Following Connor's assessment

After Connor left the cell, Decedent remained lying face down with no visible movement until Samuel and Barker entered the dry cell at approximately 9:40 p.m. and flipped Decedent over. (Doc. #266-36, Video 1945 at 9:34:00-9:59:00). The record does not establish what time the correctional officers contacted medical personnel for assistance or called a Code 16, which alerts staff of a medical crisis.

At approximately 9:42 p.m., Connor arrived. (Doc. #273-6). At approximately 9:43 p.m., Connor started to perform CPR on Decedent. (Doc. #273-6). From 9:43 to 9:45 p.m., two correctional officers arrived at the cell and took over CPR. (Doc. #273-6; Doc. #273-24). At 9:46 p.m., an AED was placed on Decedent. (Doc. #273-6). At 9:47 and 9:48 p.m., Connor administered two doses of nasal Narcan. (Doc. #265-1 at 33 ¶244; Doc. #288-1 at 70 ¶244). While officers were performing CPR, Connor conducted sternum rubs and tapped Decedent's face in an attempt to gain a response. (Doc. #265-1 at 33 ¶245; Doc. #288-1 at 70-71 ¶245).

At 9:55 p.m. EMTs arrived and placed Decedent on a gurney while CPR continued. (Doc. #273-6). At 9:58 p.m., EMTs transported Decedent out of the cell. (Doc. #273-6). At 10:20 p.m., Decedent was pronounced deceased. (Doc. #273-5 at 2).

A medical examiner performed an autopsy of Decedent and opined that Decedent's cause of death was methamphetamine intoxication. (Doc. #253-6 at 46; Doc. #253-24; Doc. #273-27).

14

The levels of methamphetamine and amphetamine, the metabolite of methamphetamine, in Decedent's blood are not consistent with the consumption of a "fingernail's amount" of methamphetamine. (Doc. #253-26 at 7). Therefore, it is more likely than not that Decedent ingested more than a "fingernail's amount" of methamphetamine. (Doc. #253-26 at 7-8).

### E.     Expert Testimony[3]

The parties' respective expert witnesses disagree on the applicable standard of care. (Doc. #253-15 at 16-17, 19; Doc. #253-25 at 20; Doc. #266-68 at 13). The experts dispute when Decedent began to show signs of methamphetamine toxicity and when escalation of medical care was required. (Doc. #253-26 at 8; Doc. #266-26 at 6, 11-13; Doc. #266-68 at 13; Doc. #266-69 at 2-3; Doc. #266-27 at 29-31). And they dispute whether methamphetamine intoxication was the <u>sole</u> cause of Decedent's death. (Doc. #253-24; Doc. #266-68 at 13).

Dr. Timothy Hughes opines Decedent's condition was initially treatable, the nurses never conducted a meaningful clinical assessment of Decedent, and any evaluation was grossly insufficient. (Doc. #266-68 at 9-10, 13; Doc. #266-69 at 3; Doc. #266-27 at 18-19). Dr. Hughes also opines the nurses' charting lacked complete documentation of the day's events, is inconsistent with video evidence, and does not reflect the seriousness of what was happening. (Doc. #266-68 at 8, 10; Doc. #266-69 at 3). Dr. Hughes opines Connor's evaluation of Decedent and the fact that she left him lying face down on the cell floor demonstrated a disregard for Decedent's safety, wellbeing, and serious medical condition. (Doc. #266-68 at 12).

Dr. Hughes's opinions are summarized as follows: with a reasonable degree of medical certainty, Decedent was suffering from an objectively serious medical condition; the medical care

---

[3] The Centurion Defendants dispute the correctness and/or validity of nearly every opinion stated by Plaintiff's experts, Dr. Timothy Hughes and Paul M. Adee, and have filed motions to exclude the experts' testimony and opinions. However, in light of the summary judgment standard, the Court assumes Plaintiff's experts' opinion testimony is admissible, unless otherwise noted.

provided to Decedent while in the custody of TCC was substandard and breached the standards of care in both correctional and community medicines; there is no standard of care consistent with the lack of medical care provided to Decedent; Decedent's death was more likely than not preventable despite Decedent's poor decisions; and the actions and/or inactions of the Centurion Defendants caused or contributed to Decedent's unnecessary pain and suffering and ultimately his death. (Doc. #266-68 at 13; Doc. #266-69 at 4).

**LEGAL STANDARD**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A court considering a motion for summary judgment must view the evidence and inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." Dryer v. NFL, 814 F.3d 938, 941-42 (8th Cir. 2016). "Once the moving party has made and supported their motion, the nonmoving party must proffer admissible evidence demonstrating a genuine dispute as to a material fact." Holden v. Hirner, 663 F.3d 336, 340 (8th Cir. 2011).

Parties resisting a motion for summary judgment "may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial." Dryer, 814 F.3d at 942 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Green Plains Otter Tail, LLC v. Pro-Env't., Inc., 953 F.3d 541, 545 (8th Cir. 2020). However, summary judgment should not be granted if a reasonable jury could find for the nonmoving party. Danker v. City of Council Bluffs, Iowa, 53 F.4th 420, 423 (8th Cir. 2022) (citing Anderson, 477 U.S. at 248).

16

In the motion before the Court, the Centurion Defendants argue summary judgment in their favor is appropriate on the remaining claims against them[4] as to Count 1 alleging breach of contract; Count 4 alleging deliberate indifference; Count 5 alleging violation of equal protection; Count 6 alleging unconstitutional policies; Count 7 alleging unconstitutional failure to train or supervise; Count 8 alleging deprivation of companionship and society; Count 10 alleging lost chance of recovery and survival; and Count 11 alleging wrongful death.

**A.      Centurion of Missouri and MHM Services are entitled to summary judgment on Count 1.**

In Count 1, Plaintiff, on behalf of Decedent, alleges a breach of contract claim against both MDOC and Centurion (Centurion of Missouri and MHM Services) on the basis that Decedent was a third-party beneficiary of the contract between MDOC and Centurion for the provision of medical services to prisoners in MDOC's custody.

In the motion for summary judgment, Centurion argues Plaintiff's Count 1 for breach of contract should be dismissed for lack of standing because Decedent was not a third-party beneficiary to the contract between MDOC and Centurion. (Doc. #253 at 32-34). In opposition, Plaintiff argues questions of fact persist over whether Decedent is a third-party beneficiary. (Doc. #272 at 24-25).

As an initial matter, a federal court exercising supplemental jurisdiction over a state law claim, like the breach of contract claim here, applies state substantive law and federal procedural law. Smith v. Planned Parenthood of St. Louis Region, 225 F.R.D. 233, 237 (E.D. Mo. 2004)

---

[4] On November 14, 2025, the Court granted in part the Centurion Defendants' motion to dismiss, which dismissed Counts 6 and 7 against the medical personnel defendants. (Doc. #171 at 21). All other claims remain pending.

(citing <u>Witzman v. Gross</u>, 148 F.3d 988, 990 (8th Cir. 1998); <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726 (1966)). The Court therefore applies Missouri substantive law.

Under Missouri law, a breach of contract claim may accrue to one who is not a signatory to a contract if he or she is a third-party beneficiary. <u>L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr. Co., L.P.</u>, 75 S.W.3d 247, 260 (Mo. 2002). "A third party beneficiary is one who is not privy to a contract or its consideration but who may nonetheless maintain a cause of action for breach of the contract." <u>Id.</u> (quoting <u>Andes v. Albano</u>, 853 S.W.2d 936, 942 (Mo. 1993)). "Only those third parties for whose primary benefit the parties contract may maintain an action." <u>Id.</u>

"Third party beneficiary rights depend on, and are measured by, the terms of the contract between the promisor and the promisee." <u>L.A.C.</u>, 75 S.W.3d at 260 (citing <u>Terre Du Lac Ass'n v. Terre Du Lac, Inc.</u>, 737 S.W.2d 206, 213 (Mo. Ct. App. 1987)). There exist three categories of third party beneficiary: "donee, creditor and incidental. The first two categories may recover, the third may not." <u>L.A.C.</u>, 75 S.W.3d at 260 (citing <u>Kan. City N. O. Nelson Co. v. Mid-Western Constr. 4 Co. of Mo., Inc.</u>, 782 S.W.2d 672, 677 (Mo. Ct. App. 1989)). "A person is a donee beneficiary if the purpose of the promisee in obtaining the promise … [is] to confer upon [the beneficiary] a right against the promisor …." <u>Id.</u> "A person is a creditor beneficiary if the performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary." <u>Id.</u> If the beneficiary falls into neither of these categories, he or she is an incidental beneficiary, for which no claim for breach of contract may lie. <u>Id.</u>

The contract between MDOC and Centurion contains the following provision:

> The contract is not intended to create any rights, liberty interest, or entitlements in favor of any individual. The contract is intended only to set forth the rights and responsibilities of the parties hereto. Therefore, it is expressly understood and agreed that enforcement of the terms and conditions of the contract, and all rights or action relating to such enforcement, shall be strictly reserved to the parties hereto, and nothing contained in the contract shall give or allow any claim or right

18

of action whatsoever by any other person on the agreement. It is the express intention of the parties hereto that any entity, other than the parties hereto, receiving services or benefits under the contract shall be deemed an incidental beneficiary only.

(Doc. #253-23 at 1-2).

Centurion argues the plain terms of the contract deem Plaintiff and Decedent incidental beneficiaries, and therefore, Plaintiff, on behalf of Decedent or herself, cannot maintain a breach of contract claim as a third-party beneficiary. (Doc. #253 at 32-34). In response, Plaintiff argues that the Centurion Defendants have not submitted a complete and executed copy of the contract, thereby preventing Plaintiff and the Court from construing the contract as a whole. (Doc. #272 at 24-25).

"[C]ontract interpretation is a question of law to be decided by the courts." Bell v. Shelter Gen. Ins. Co., 701 S.W.3d 614, 619 (Mo. 2024). The best evidence of the contents of the contract is the contract itself. United States v. Buchanan, 604 F.3d 517, 522 (8th Cir. 2010) (citing Fed. R. Evid. 1002). However, "[t]he standard for admissibility at the summary judgment stage is simply whether the evidence in question could be presented at trial in admissible form." SBFO Operator No. 3, LLC v. Onex Corp., 663 F. Supp. 3d 990, 1006 (E.D. Mo. 2023) (citing Gannon Int'l, Ltd. v. Blocker, 684 F.3d 785, 793 (8th Cir. 2012)). Consequently, Centurion's failure to submit a complete and executed copy of the contract on the summary judgment record does not automatically defeat summary judgment.

Centurion has submitted as evidence a request for admission admitting that the provision is contained in the contract between MDOC and Centurion. (Doc. #253-23 at 1-2). Plaintiff has not submitted evidence controverting its existence or argued that the contract and its provisions cannot be presented in an admissible form. Gannon Int'l, 684 F.3d at 793. While not admissible at

19

trial, Fed. R. Evid. 802, the request for admission is sufficient at summary judgment. <u>Gannon Int'l</u>, 684 F.3d at 793.

Turning to the merits, "an agreement must 'clearly express an intent to benefit' a third-party in order for the third-party to attain third-party beneficiary status." <u>Seeck v. Geico Gen. Ins. Co.</u>, 212 S.W.3d 129, 135 (Mo. 2007) (quoting <u>Netco, Inc. v. Dunn</u>, 194 S.W.3d 353, 358 (Mo. 2006)). Where there is no express declaration of intent to benefit a third-party, it is presumed that the parties contracted to benefit only themselves, and the third party is not a beneficiary. <u>Id.</u>

Here, there is no express declaration that MDOC and Centurion intended to benefit any third-party. Indeed, the contract expressly states that any party receiving services or benefits as a result of the contract are incidental beneficiaries only and expressly excludes any other person or entity the right to enforce the contract. (Doc. #253-23 at 1-2).

Consequently, Plaintiff, on behalf of Decedent or herself, has no standing to assert a claim for the breach of the contract between MDOC and Centurion. <u>See</u> <u>Moore v. Corizon, LLC</u>, No. 4:15-CV-597 RLW, 2015 WL 5813231, at *4 (E.D. Mo. Oct. 5, 2015) (finding prisoner lacked standing to assert a breach of contract claim as a third-party beneficiary of a contract that contained an identical provision). Centurion is, thus, granted summary judgment on Count 1.

> **B.      Gaines and Behr are entitled to summary judgment on Count 4. Questions of fact preclude summary judgment on the claims alleged in Count 4 against Centurion of Missouri, MHM Services, Townsend, Mefford, and Connor.**

In Count 4, Plaintiff, on behalf of Decedent, alleges the Centurion Defendants were deliberately indifferent to Decedent's serious medical needs in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.[5] (Doc. #117 at 41-43). Plaintiff brings the claim against Centurion and the individual Medical Personnel defendants.

---

[5] Section 1983 creates a cause of action for violations of the United States Constitution against state actors. <u>Crumpley-Patterson v. Trinity Lutheran Hosp.</u>, 388 F.3d 588, 590 (8th Cir. 2004) (quoting 42 U.S.C. § 1983). Private parties are

20

The Centurion Defendants argue that: (1) Plaintiff cannot establish the prima facie case that Decedent had a serious medical need; (2) Plaintiff cannot establish that the Centurion Defendants were deliberately indifferent to Decedent's serious medical need; (3) there is insufficient evidence that the Centurion Defendants caused or contributed to cause Decedent's injuries and/or death; and (4) Plaintiff lacks the requisite expert testimony to establish Count 4. (Doc. #253 at 17-27, 36-38). In opposition, Plaintiff argues genuine issues of material fact preclude summary judgment. (Doc. #272 at 8-17, 28-24).

The failure to provide proper medical care to a prisoner in state custody violates the Eighth Amendment when the medical provider is "deliberately indifferent to the prisoner's serious medical needs." Phillips v. Jasper Cnty. Jail, 437 F.3d 791, 795 (8th Cir. 2006) (citing Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)). A claim of deliberate indifference to a prisoner's serious medical needs requires a two-part showing. Schaub v. VonWald, 638 F.3d 905, 914 (8th Cir. 2011). The plaintiff must establish (1) the inmate suffered from an objectively serious medical need (2) of which the prison official knew yet deliberately disregarded. Id.; Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000).

A medical need is objectively serious if it "has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Jones v. Minn. Dep't of Corrs., 512 F.3d 478, 481 (8th Cir. 2008) (citation omitted). The second part of the two-part showing is a subjective inquiry and asks whether "the defendant official acted with a 'sufficiently culpable state of mind.'" Kulkay v. Roy, 847 F.3d 637, 643 (8th Cir. 2017) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). Both parts of the deliberate

---

liable under § 1983 only when they act under color of state law. Id. The Centurion Defendants do not challenge the application of § 1983 against them.

21

indifference test are fact-intensive inquiries. <u>Jones</u>, 512 F.3d at 482; <u>Meuir v. Green Cnty. Jail Employees</u>, 487 F.3d 1115, 1118 (8th Cir. 2007).

Based on Decedent's behavior captured by video and his ingestion of suspected methamphetamine, a reasonable jury could find Decedent had a serious medical need because a layperson could find it obvious that medical attention from a doctor was necessary. <u>See</u> <u>Phillips v. Jasper Cnty. Jail</u>, 437 F.3d 791, 795 (8th Cir. 2006). The primary question is whether the individual medical personnel actually knew of Decedent's serious medical need and deliberately disregarded it. <u>Starks v. St. Louis Cnty.</u>, 159 F.4th 1146, 1149 (8th Cir. 2025).

"Section 1983 liability is personal" and requires "specific facts of personal involvement" in the constitutional violation. <u>Jones v. City of St. Louis</u>, 104 F.4th 1049, 1049 (8th Cir. 2024). As such, the Court examines each Centurion Defendant's actions and/or omissions separately.

Plaintiff brings Count 4 against Centurion based on Centurion's failure to train and/or its maintenance of custom, policy, or practice of deliberate indifference to prisoner's serious medical needs and not based on vicarious liability. (Doc. #171 at 6-7). Thus, her Count 4 claims against Centurion of Missouri and MHM Services are similar to her claims in Counts 6 and 7 and are addressed below.

Turning to the individual medical personnel, Plaintiff does not have sufficient evidence to establish deliberate indifference claims against Kristy Gaines and Robin Behr, but questions of material facts preclude summary judgment as to Nicole Townsend, Anna Mefford, and Cara Connor.

### 1. *Plaintiff has not presented sufficient evidence showing Kristy Gaines had actual knowledge of Decedent's serious medical needs.*

First, there is insufficient evidence that Gaines actually knew Decedent had a serious medical need. Gaines never evaluated or interacted with Decedent during the relevant time period.

22

She did not observe his behavior. At most, Gaines knew that Decedent consumed suspected methamphetamine and that the correctional officers planned to pepper spray him for failure to comply with directives. She had no control over the ultimate decision to pepper spray Decedent.

Even if Gaines knew Decedent had a medical need, she did not have a "sufficiently culpable state of mind." Kulkay, 847 F.3d at 643. "The prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995). "[D]eliberate indifference requires a highly culpable state of mind approaching actual intent," Kulkay, 847 F.3d at 643 (citation omitted), and is akin to criminal-law recklessness. Schaub, 638 F.3d at 914-15.

The facts, even viewed in Plaintiff's favor, do not establish Gaines acted with a state of mind approaching actual intent or criminal-law recklessness. In light of the specific circumstances here, Gaines's failure to provide adequate medical care might constitute medical malpractice. But medical malpractice, like all negligence claims, is insufficient to establish the requisite state of mind. Estelle, 429 U.S. at 105-06.

### 2. *Plaintiff cannot establish Robin Behr acted with deliberate indifference.*

Similarly, Plaintiff cannot establish Behr was deliberately indifferent to Decedent's serious medical condition. It is undisputed that Behr was in training on April 7, 2023. Despite her experience as a nurse elsewhere, there is no evidence Behr had any knowledge in how to treat a person who had been pepper sprayed and, if she had been so trained, that she had any authority to intervene in Townsend's and Mefford's care of Decedent. Beyond the initial decontamination, there is no evidence Behr observed other medical encounters between Decedent and the other nurses. Under these circumstances, Behr did not have the requisite intent of deliberate indifference.

23

**3.** *Questions of fact preclude summary judgment on the Count 4 claims against Townsend, Mefford, and Connor.*

Viewing the facts in Plaintiff's favor, a reasonable jury could find Townsend, Mefford, and/or Connor were deliberately indifferent to Decedent's serious medical needs.

Mefford was the first nurse to encounter Decedent after he arrived in Segregation. Mefford did not take Decedent's vitals, and her notes are not entirely consistent with the actual interaction. Although Mefford did mark that Decedent should be examined every two hours per MDOC's policies require for intoxicated prisoners, she also marked that examinations every four hours were appropriate.

Mefford's second encounter with Decedent was after he was pepper sprayed and restrained to the bench in the Segregation intake area. At that time, she knew he had ingested suspected methamphetamine after already being intoxicated. After waiting for the correctional officers to start recording, Mefford and Townsend decontaminated Decedent's face by using gauze pads to wipe his face and then flushed his eyes with a liquid for less than one minute. Mefford again did not take his vitals.

When officers moved Decedent back to the dry cell, video evidence does not show Mefford and/or Townsend checking all of Decedent's restraints. And again, Mefford did not check his vitals. When charting the second encounter, Mefford inconsistently marked that Decedent should be examined every two hours and every four hours.

The parties' experts disagree whether Mefford's actions met the standard of care, creating a question of fact. A reasonable jury could find Mefford possessed a sufficiently culpable state of mind based on the following facts, viewed in Plaintiff's favor: Mefford's failure to take vitals; Mefford's failure to ensure Decedent was examined every two hours; her personal observation of

24

Decedent's deteriorating condition; and her incorrect and internally inconsistent charting that minimized the severity of Decedent's condition.

For these same reasons, Plaintiff's deliberate indifference claim against Townsend survives summary judgment. Like Mefford, Townsend did not take Decedent's vitals. Unlike Mefford, Townsend did not even chart her encounters with Decedent. Additionally, when Montes informed Townsend that Decedent had swallowed a baggie of suspected methamphetamine, Townsend did not immediately respond to examine him. Nor did she send any other medical personnel to examine him. Instead, medical personnel's first encounter with Decedent was nearly one-and-a-half hours later when Townsend arrived after the officers pepper sprayed Decedent. And she arrived without any medical equipment. These facts could support a reasonable jury finding of deliberate indifference.

Mefford and Townsend also failed to provide Connor with adequate information about Decedent's condition before they left. They did not utilize the overdose/ingestion/Narcan protocol. Nor did they chart on the pepper agent protocol. Mefford and/or Townsend told Connor that Connor should reassess Decedent at 9:30 p.m., beyond the two-hour time frame required by MDOC policies. A reasonable jury could construe the deficient communication as further evidence of deliberate indifference.

Connor's first encounter with Decedent was at approximately 9:30 p.m., four hours after his last encounter with medical personnel. Connor did not take Decedent's vitals. She did not make him sit up or roll to his side or back from the prone position. Her checks of the restraints were not thorough. Moreover, Connor did not adjust the belly chain, which had migrated to Decedent's upper chest. Decedent did not respond to her questions. Although Connor properly responded to

the Code 16, a reasonable jury could find that Connor was deliberately indifferent to Decedent's serious medical needs during the 9:30 p.m. encounter.

Viewing the facts in Plaintiff's favor, a reasonable jury could find Mefford, Townsend, and Connor were deliberately indifferent to Decedent's serious medical needs. As such, summary judgment in their favor on Court 4 is not warranted.

**C.      The Centurion Defendants are entitled to summary judgment on Count 5.**

In Count 5, Plaintiff, on behalf of Decedent, alleges a claim under § 1983 for violation of his rights under the Fourteenth Amendment for equal protection as a "class of one" against the Centurion Defendants.

The Centurion Defendants argue that Plaintiff has not provided a "specific and detailed account" of how similarly situated prisoners were treated more favorably than Decedent and/or the situations of the comparators are materially different. (Doc. #253 at 31-32). In opposition, Plaintiff argues questions of material facts remain regarding whether Plaintiff was treated less favorably. (Doc. #272 at 22-24).

The Equal Protection Clause of the Fourteenth Amendment commands that no State may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. To establish a class-of-one equal protection claim, Plaintiff must demonstrate the Centurion Defendants (1) treated Decedent differently from other prisoners who are similarly situated, (2) did so intentionally; and (3) without a rational basis for the differential treatment. Mathers v. Wright, 636 F.3d 396, 399 (8th Cir. 2011). "Any material difference between how the plaintiff and those allegedly treated more favorably are situated is sufficient to provide a rational basis for the differential treatment." Bruning v. City of Omaha, Neb., 6 F.4th 821, 825 (8th Cir. 2021). "A class-of-one plaintiff must therefore provide a specific and detailed account of the nature of the preferred

26

treatment of the favored class, especially when the state actors exercise broad discretion to balance a number of legitimate considerations." <u>Nolan v. Thompson</u>, 521 F.3d 983, 990 (8th Cir. 2008) (quotation omitted).

Plaintiff contends Decedent was treated differently because he "was intentionally denied medical treatment, as compared to other inmates who were medically monitored after ingesting an illicit substance, who were not tortured with pepper spray, who were decontaminated after being pepper sprayed, and who were provided with medical assistance when requested." (Doc. #272 at 22-24). Plaintiff uses the prisoner located in the adjacent dry cell as a comparator.

But Plaintiff does not present evidence demonstrating how the Centurion Defendants treated the prisoner in the adjacent dry cell any differently that Decedent. Mefford conducted the initial segregation evaluations of the prisoner in the adjacent dry cell and Decedent in the same visit to Segregation and in the order the two prisoners arrived. Plaintiff does not demonstrate there was any material difference between the evaluations of the two prisoners.

The differential treatment began after Mefford left Segregation and did not involve the Centurion Defendants. By the time medical personnel returned to Segregation, correctional officers had relocated the other prisoner. There is no evidence medical personnel treated the other prisoner for the injuries Decedent had on April 7, 2023.

Similarly, there is no evidence establishing that the Centurion Defendants treated Carjuan Adkins differently. Plaintiff argues the Centurion Defendants have not established they treated Adkins similarly. (Doc. #272 at 22-24). But Plaintiff bears the burden to prove differential treatment. <u>See</u> <u>Dryer</u>, 814 F.3d at 942. Plaintiff has not met that burden. Summary judgment on Count 5 is granted.

**D. Questions of fact preclude summary judgment on Counts 6 and 7.**

In Count 6, Plaintiff, on behalf of Decedent, alleges a claim against Centurion for unconstitutional policies, customs, and/or practices. In Count 7, Plaintiff, on behalf of Decedent, alleges Centurion failed to train and/or supervise the nurses in violation of the Constitution.

Centurion argues the Court should grant summary judgment on Counts 6 and 7 because (1) there is no underlying constitutional violation; (2) Centurion did not have any policies or customs – the policies and customs used were those of MDOC; and (3) there is insufficient evidence to support Centurion had notice of a pattern of unconstitutional acts. (Doc. #253 at 27-31). In opposition, Plaintiff argues Centurion adopted and implemented MDOC's policies and deliberately or recklessly failed to train its medical personnel to provide necessary medical care. (Doc. #272 at 18-22).

Centurion's first argument is a non-starter. As discussed above, material factual disputes remain regarding whether Mefford, Townsend, and Connor were deliberately indifferent to Decedent's serious medical needs.

Next, Centurion can only be held liable under § 1983 for its own unconstitutional policies. See Crumpley-Patterson v. Trinity Lutheran Hosp., 388 F.3d 588, 590 (8th Cir. 2004) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978)). Legal and factual questions remain regarding whether Centurion adopted MDOC's policies and customs as their own.

Neither party submitted the entire contract into the summary judgment record, and the Centurion Defendants do not dispute that the relevant contract requires Centurion to adopt MDOC's policies. However, the parties do not delve into the legal issue of whether said contract provision converted MDOC's policies into Centurion's policies for purposes of the Monell claims. Even though contract interpretation is generally a question of law, Bell, 701 S.W.3d at 619, the

Court declines to resolve the legal question without briefing from the parties and without the benefit of the provision(s) at issue.

Regardless, viewing the facts in Plaintiff's favor, Centurion did have an unofficial custom to follow MDOC's policies. Therefore, if MDOC's policies were unconstitutional, Centurion's custom of following MDOC's policies was also unconstitutional.

To prove the existence of an unconstitutional custom, the plaintiff must show (1) a continuing, widespread pattern of unconstitutional conduct by the entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the entity's policymaking officials after notice; and (3) the unofficial custom was the "moving force" behind the constitutional violation. Crumpley-Patterson, 388 F.3d at 590-91. Plaintiff has put forth expert opinion evidence that the pepper spray policies on their face and as-applied, including as relevant here the decontamination procedures, were unconstitutional.

Further, viewing the facts in Plaintiff's favor, Centurion had its own unconstitutional custom of abbreviated and inadequate medical assessments of prisoners. Consistent across the individual medical personnel defendants, none took a full set of Decedent's vitals and their checks of Decedent's restraints were cursory. And despite a written MDOC policy that inmates in Decedent's state should be checked every two hours, none followed that policy. Based on this evidence, a reasonable jury could find Centurion had an unofficial custom to provide abbreviated, sub-par medical care to prisoners.

This same evidence could also establish that Centurion did not properly train or supervise its employees. The prima facie case for a failure to train or supervise claim is similar to that for an unofficial custom claim. To establish Centurion's liability under § 1983 for a failure to train or supervise, Plaintiff must show Centurion "(1) had notice of a pattern of unconstitutional acts

29

committed by [its employees]; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take sufficient remedial action; (4) proximately causing" Decedent's injuries and death. Livers v. Schenck, 700 F.3d 340, 355 (8th Cir. 2012) (citation omitted).

Centurion argues Plaintiff cannot establish that it had notice of a pattern of unconstitutional acts committed by its Medical Personnel. (Doc. #253 at 30). Centurion had notice of MDOC's policies on correction-specific issues (i.e., dry cell procedures, use of pepper spray) that required training beyond that in a typical care setting. See Livers, 700 F.3d at 356 (no need to train to not fabricate evidence); Andrews v. Fowler, 98 F.3d 1069, 1077 (8th Cir. 1996) (no need to train not to rape when it is "patently obvious" such conduct is prohibited). It is not "patently obvious" how to treat prisoners on dry cell status or ones that have been pepper sprayed. Yet Centurion relied exclusively on MDOC to train its employees on those policies and took no responsibility to ensure its employees actually received said training, understood the training, or supervised its employees after they were trained. Under these circumstances, a reasonable jury could find that Centurion had notice that unconstitutional acts by its employees were likely happening but purposely ignored such acts by pawning off all training and supervision to MDOC.

One instance of inadequate care, even if fatal, does not establish a pattern of unconstitutional conduct sufficient to maintain Counts 6 and 7 against Centurion. See Brewington v. Keener, 902 F.3d 796, 803 (8th Cir. 2018) ("[A] single incident cannot serve as notice for a pattern of misconduct."); Mettler v. Whitledge, 165 F.3d 1197, 1205 (8th Cir. 1999) (single incident does not prove existence of custom); However, Plaintiff has produced evidence that all three Centurion employees providing direct care to Decedent on April 7, 2023, failed him in the same or similar ways on multiple occasions in a relatively short time span. Because a reasonable jury could find in Plaintiff's favor, summary judgment on Counts 6 and 7 is not proper.

**E.** **Gaines and Behr are entitled to summary judgment on Count 8. Questions of fact preclude summary judgment on the claims alleged in Count 8 against Centurion of Missouri, MHM Services, Townsend, Mefford, and Connor.**

In Count 8, Plaintiff, on her own behalf, alleges a claim under § 1983 that the Centurion Defendants deprived her of her liberty interest in her son's companionship and society in violation of the Fourteenth Amendment. The parties briefed Count 8 in conjunction with Count 4 without specifying the prima facie case for a deprivation of companionship and society claim or otherwise distinguishing the two claims. Consequently, the Court presumes that the parties agree Count 8 rises and/or falls with Count 4.

For the reasons stated in the section addressing Count 4, summary judgment is granted on Plaintiff's Count 8 claims against Gaines and Behr but is denied on the Count 8 claims against Centurion, Townsend, Mefford, and Connor.

**F.** **Centurion of Missouri, MHM Services, Gaines, and Behr are entitled to summary judgment on Counts 10 and 11. Questions of fact preclude summary judgment on the claims alleged in Counts 10 and 11 against Townsend, Mefford, and Connor.**

In Count 10, Plaintiff, on behalf of Decedent, alleges a claim for lost chance of recovery and survival under Mo. Rev. Stat. § 537.020 against the Centurion Defendants. In Count 11, Plaintiff alleges a claim for wrongful death under Mo. Rev. Stat. § 537.080 against the Centurion Defendants.

*1.* *Missouri law bars the claims alleged in Counts 10 and 11 against Centurion of Missouri and MHM Services.*

Centurion of Missouri and MHM Services seek summary judgment on Counts 10 and 11 against them under Mo. Rev. Stat. § 538.210. (Doc. #253 at 34-35). This statute provides:

> No health care provider whose liability is limited by the provisions of this chapter shall be liable to any plaintiff based on the actions or omissions of any other entity or individual who is not an employee of such health care provider, unless the individual is an employee of a subsidiary in which the health care provider has a

31

controlling interest and the subsidiary does not carry a professional liability insurance policy or self-insurance covering said individual of at least one million dollars per occurrence and a professional liability insurance policy or self-insurance covering said subsidiary of at least one million dollars per occurrence.

Mo. Rev. Stat. § 538.210.4. Because this statute determines whether a party can be held vicariously liable in tort for the conduct of another party, it is substantive in nature and must be applied by federal courts asserting supplemental jurisdiction over a state law claim. Smith, 225 F.R.D. at 237.

Even if Centurion of Missouri held out the individual medical personnel defendants as its own employees, they were actually employees of MHM Health Professionals, not Centurion of Missouri nor MHM Services. It is uncontroverted that MHM Health Professionals is not a subsidiary of Centurion of Missouri. Thus, under the plain language of the statute, Centurion of Missouri cannot be held vicariously liable for any act or omission of the nurses. See United States v. Lester, 92 F.4th 740, 742 (8th Cir. 2024) (statutory interpretation beings with the plain language).

MHM Health Professionals is, however, a subsidiary of MHM Services. Thus, MHM Services may be vicariously liable if MHM Health Professionals "does not carry a professional liability insurance policy or self-insurance covering [each nurse] of at least one million dollars per occurrence …." Mo. Rev. Stat. § 538.210.4. Plaintiff admitted that "[a]ll of the [nurses] in this case are covered by insurance policies with in excess of $1 million of coverage." (Doc. #266 at 24, ¶74). Thus, MHM Services is not vicariously liable for the nurses' alleged wrongful acts and/or omissions.

Plaintiff cites no law supporting her argument that § 538.210.4 should not apply under the circumstances of this case. Therefore, as a matter of law, Plaintiff's claims against Centurion of Missouri and MHM Services in Counts 10 and 11 may not proceed.

**2.** ***Questions of fact preclude summary judgment on the claims alleged in Counts 10 and 11 against Townsend, Mefford, and Connor.***

The Centurion Defendants argue Plaintiff lacks sufficient evidence, including expert support, that the Centurion Defendants' acts or omissions caused or contributed to Decedent's death. (Doc. #253 at 36-38).

Expert testimony is required to prove causation for Counts 10 and 11. See Alberson v. Norris, 458 F.3d 762, 765-66 (8th Cir. 2006) (expert testimony required to prove causation in claims involving the mistreatment of prisoner's medical condition); Sundermeyer v. SSM Reg'l Health Servs., 271 S.W.3d 552, 554 (Mo. 2008) (expert testimony required to establish causation in medical malpractice case); Portis v. Greenhaw, 38 S.W.3d 436, 441 (Mo. Ct. App. 2001) (expert testimony required in wrongful death case against radiologist).

Here, the parties present competing expert testimony. Plaintiff's expert, Dr. Hughes, opines the nurses' acts and omissions did not meet the standard of care and contributed to Decedent's suffering and death. The Centurion Defendants' expert, Dr. Fowlkes, opines intervention by the nurses would not have changed the outcome. The conflicting expert testimony creates a material dispute precluding summary judgment. See Kuhn v. Wyeth, Inc., 686 F.3d 618, 625 (8th Cir. 2012) ("[T]rial courts are not empowered to determine which of several competing scientific theories has the best provenance.").

That said, Plaintiff lacks sufficient evidence to establish that the acts or omissions of Gaines and Behr caused Decedent's injuries and/or death for the same reasons Gaines and Behr are not liable under Count 4.

Summary judgment on Counts 10 and 11 is granted for the claims against Centurion of Missouri, MHM Services, Gaines, and Behr but is denied for the claims against Townsend, Mefford, and Connor.

### H. Plaintiff's request for punitive damages may proceed to trial.

Plaintiff seeks punitive damages for both her federal constitutional claims and the state law claims. To receive a punitive damage award for her federal claims, Plaintiff must prove the defendant's conduct was "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S.30, 56 (1983). Under Missouri law:

> an award of punitive damages against a health care provider governed by the provisions of sections 538.205 to 538.2301 shall be made only upon a finding by the jury that the evidence clearly and convincingly demonstrated that the health care provider intentionally caused damage to the plaintiff or demonstrated malicious misconduct that caused damage to the plaintiff. Evidence of negligence including, but not limited to, indifference to or conscious disregard for the safety of others shall not constitute intentional conduct or malicious misconduct.

Mo. Rev. Stat. § 538.210.8.

As previously discussed, Plaintiff has not established Gaines's and Behr's conduct caused or contributed to Decedent's injuries and/or death. Therefore, Plaintiff is not entitled to punitive awards against Gaines and Behr. However, questions of fact remain regarding Townsend's, Mefford's, and Connor's states of mind, thereby precluding summary judgment against them and Centurion on punitive damages.

### CONCLUSION

For the reasons stated above, summary judgment is granted on the following claims: Count 1 against Centurion of Missouri and MHM Services; Count 4 against Gaines and Behr; Count 5 against Centurion of Missouri, MHM Services, Gaines, Behr, Townsend, Mefford, and Connor; Count 8 against Gaines and Behr; Count 10 against Centurion of Missouri, MHM Services, Gaines, and Behr; Count 11 against Centurion of Missouri, MHM Services, Gaines, and Behr; and punitive damages against Gaines and Behr.

The following claims survive the Centurion Defendants' motion for summary judgment: all claims against the MDOC Defendants, unless voluntarily dismissed previously; Count 4 against Centurion of Missouri, MHM Services, Townsend, Mefford, and Connor; Count 6 against Centurion of Missouri and MHM Services; Count 7 against Centurion of Missouri and MHM Services; Count 8 against Centurion of Missouri, MHM Services, Townsend, Mefford, and Connor; Count 10 against Townsend, Mefford, and Connor; and Count 11 against Townsend, Mefford, and Connor. Additionally, Plaintiff's claim for punitive damages, except against Gaines and Behr, survives. Accordingly, is hereby

ORDERED the Centurion Defendants' Motion for Summary Judgment (Doc. #252) is GRANTED IN PART and DENIED IN PART. Summary judgment in the Centurion Defendants' favor shall be entered on Count 1 against Centurion of Missouri and MHM Services; Count 4 against Gaines and Behr; Count 5 against Centurion of Missouri, MHM Services, Gaines, Behr, Townsend, Mefford, and Connor; Count 8 against Gaines and Behr; Count 10 against Centurion of Missouri, MHM Services, Gaines, and Behr; Count 11 against Centurion of Missouri, MHM Services, Gaines, and Behr; and punitive damages against Gaines and Behr. All other claims, including for punitive damages, remain pending.

IT IS SO ORDERED.

DATED: June 3, 2026

/s/ Brian C. Wimes
BRIAN C. WIMES, CHIEF JUDGE
UNITED STATES DISTRICT COURT